12-2335-cv(L)
Windsor v. United States

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: September 27, 2012    Decided: October 18, 2012)

Docket No. 12-2335-cv(L); 12-2435(Con)

- - - - - - - - - - - - - - - - - - - - -x

EDITH SCHLAIN WINDSOR, IN HER OFFICIAL CAPACITY AS EXECUTOR
OF THE ESTATE OF THEA CLARA SPYER,

Plaintiff-Appellee,

- v.-

UNITED STATES OF AMERICA,

Defendant-Appellant,

and

BIPARTISAN LEGAL ADVISORY GROUP OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,

Intervenor-Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, Chief Judge, STRAUB and DRONEY,
               Circuit Judges.

Intervenor Bipartisan Legal Advisory Group of the

United States House of Representatives appeals from an order

of the United States District Court for the Southern

District of New York granting summary judgment in favor of

the surviving spouse of a same-sex couple who was denied the benefit of the spousal deduction under federal tax law.  The United States, the defendant, is a nominal appellant.  For the following reasons, we conclude that Section 3 of the Defense of Marriage Act violates equal protection and is therefore unconstitutional.

Judge STRAUB dissents in part and concurs in part in a separate opinion.

STUART F. DELERY, Acting Assistant Attorney General, United States Department of Justice, Washington, DC (Michael Jay Singer, August E. Flentje, on the brief), for Defendant-Appellant.

PAUL D. CLEMENT, Bancroft PLLC, Washington, DC (H. Christopher Bartolomucci, Conor B. Dugan, and Nicholas J. Nelson, on the brief; Kerry W. Kircher, William Pittard, Christine Davenport, Todd B. Tatelman, Mary Beth Walker, Office of General Counsel, United States House of Representatives, Washington, DC, of counsel), for Intervenor-Defendant-Appellant.

ROBERTA A. KAPLAN, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY (Andrew J. Ehrlich, Jaren Janghorbani, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, James D. Esseks and Rose A. Saxe, American Civil

Liberties Union, New York, NY, and Melissa Goodman, Arthur Eisenberg, and Mariko Hirose, New York Civil Liberties Union Foundation, New York, NY, on the brief), for Appellee.

Vincent P. McCarthy, Litchfield, CT, for amicus curiae American College of Pediatricians in support of Intervenor-Defendant-Appellant.

Joseph A. Campbell, Alliance Defending Freedom, Scottsdale, AZ, for amicus curiae Frederick Douglas Foundation in support of Intervenor-Defendant-Appellant.

Cecilia Noland-Heil, American Center for Law & Justice, Virginia Beach, VA (Erik Zimmerman, Jay Alan Sekulow and Stuart J. Roth, American Center for Law & Justice, Virginia Beach, VA and Washington, DC, on the brief), for amici curiae Former Attorneys General Edwin Meese III and John Ashcroft in support of Intervenor-Defendant-Appellant.

Gregory F. Zoeller, Attorney General, State of Indiana, Indianapolis, IN (Thomas M. Fisher, Solicitor General, Ellen H. Meilaender, Deputy Attorney General, on the brief), for amici curiae States of Indiana, Alabama, Alaska, Arizona, Colorado, Georgia, Idaho, Kansas, Michigan, Nebraska, Oklahoma, South Carolina, South Dakota and Virginia in support

of Intervenor-Defendant-Appellant.

Joshua K. Baker, National Organization for Marriage, Washington, DC (William C. Duncan, Marriage Law Foundation, Lehi, UT, on the brief), for amicus curiae National Organization for Marriage in support of Intervenor-Defendant-Appellant.

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, VA, for amicus curiae Concerned Women for America in support of Intervenor-Defendant-Appellant.

William F. Sheehan, Goodwin Procter LLP, Washington, DC (Andrew S. Hudson, Goodwin Procter LLP, Washington, DC and Nathalie F.P. Gilfoyle, American Psychological Association, Washington, DC, on the brief), for amici curiae the American Psychological Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychoanalytic Association, the National Association of Social Workers and its New York City and State Chapters, and the New York State Psychological Association in support of Plaintiff-Appellee.

Susan L. Sommer, Lambda Legal Defense & Education Fund, Inc., New York, NY (Timothy S. Fischer and Brian P. Rice, McCarter &

4

English, LLP, Hartford, CT and Shannon P. Minter and Christopher F. Stoll, National Center for Lesbian Rights, San Francisco, CA, on the brief), for amici curiae Bar Associations and Public Interest and Legal Service Organizations in Support of Plaintiff-Appellee.

Matthew F. Damm, O'Melveny & Myers LLP, New York, NY (Dawn Sestito, Demitri D. Portnoi, and Amy R. Lucas, O'Melveny & Myers LLP, Los Angeles, CA and New York, NY, on the brief), for amici curiae Family Law Professors in Support of Plaintiff-Appellee.

Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY (Francis F. Caputo, Susan Paulson, on the brief), for amici curiae the City of New York, the Council of the City of New York, Michael R. Bloomberg, in His Official Capacity as Mayor of the City of New York, and Christine C. Quinn, in Her Official Capacity as Speaker of the Council of the City of New York in Support of Plaintiff-Appellee.

Mark Wolinsky, Wachtell, Lipton, Rosen & Katz, New York, NY (Jonathan M. Moses, Kevin S. Schwartz, Luke M. Appling, on the brief), for amicus curiae the Partnership for New York City in Support of Plaintiff-Appellee.

5

Suzanne B. Goldberg, Columbia Law School, New York, NY, for amicus curiae Columbia Law School Sexuality & Gender Law Clinic in Support of Plaintiff-Appellee.

Catherine R. Connors, Pierce Atwood LLP, Portland, ME, for amici curiae Historians in Support of Plaintiff-Appellee.

Miriam R. Nemetz, Mayer Brown LLP, Washington, DC (Kathleen Connery Dawe and Michael B. Kimberly, Mayer Brown LLP, Washington, DC, and Heather C. Sawyer, Committee on the Judiciary, John Conyers, Jr., and Jerrold Nadler, Ranking Members, Washington, DC), for amici curiae Members of the U.S. House of Representatives, in Support of Plaintiff-Appellee.

Nicole G. Berner, Washington, DC (James B. Coppess, AFL-CIO, Washington, DC, Patrick Szymanski, Change to Win, Washington, DC, and Alice O'Brien, National Education Association, Washington, DC, on the brief), for amici curiae American Federation of Labor and Congress of Industrial Organizations, Change to Win, and National Education Association in support of Plaintiff-Appellee.

Joseph F. Tringali, Simpson Thacher & Bartlett LLP, New York, NY (Alexandra C. Pitney and Nicholas S. Davis, on the

brief), _for amici curiae Service and Advocacy for Gay, Lesbian, Bisexual and Transgender Elders (SAGE), National Senior Citizens Law Center and American Society on Aging in support of Plaintiff-Appellee_.

Debo P. Adegbile, NAACP Legal Defense & Education Fund, Inc., New York, NY (Elice C. Boddie, Rachel M. Kleinman, Ria A. Tabacco, Joshua Civin, NAACP Legal Defense & Education Fund, Inc., New York, NY, and Washington, DC), _for amicus curiae NAACP Legal Defense & Education Fund, Inc., in support of Plaintiff-Appellee_.

Harvey J. Wolkoff, Ropes & Gray LLP, New York, NY (Stuart W. Yothers and Samuel P. Bickett, Ropes & Gray LLP, New York, NY and Steven M. Freeman and Seth M. Marnin, Anti-Defamation League, New York, NY, _on the brief_), _for amici curiae Anti-Defamation League, Central Conference of American Rabbis, Congregation Beit Simchat Torah, Bend the Arc: A Jewish Partnership for Justice, Hadassah: the Women's Zionist Organization of America, the Hindu American Foundation, Interfaith Alliance Foundation, Japanese Citizens League, the Justice and Witness Ministries: United Church of Christ, National Counsel of Jewish Women, People for the American Way Foundation, Union for Reform Judaism, Women's League for_

Conservative Judaism, and Women of Reform Judaism in support of Plaintiff-Appellee.

Sharon L. Nelles, Sullivan & Cromwell LLP, New York, NY (H. Rodgin Cohen, Mitchell S. Eitel, William H. Wagener, Heather H. Volik, Diana G. Iskelov, Sullivan & Cromwell LLP, New York, NY and Laura W. Brill and Meaghan Field, Kendall Brill & Klieger LLP, Los Angeles, CA, on the brief), for amici curiae Professors of Family and Child Welfare Law in support of Plaintiff-Appellee.

Eric T. Schneiderman, Attorney General, State of New York, New York, NY (William H. Sorrell, Attorney General, State of Vermont, Montpelier, VT and George Jepsen, Attorney General, State of Connecticut, Hartford, CT, on the brief) for amici curiae States of New York, Vermont, and Connecticut in support of neither party.

Melanie Sloan, Citizens for Responsibility and Ethics in Washington, Washington, DC, (Anne L. Weismann, Citizens for Responsibility and Ethics in Washington, Washington, DC and Alan B. Morrison, George Washington Law School, Washington, DC, on the brief), for amicus curiae Citizens for Responsibility and Ethics in Washington in support of neither party.

DENNIS JACOBS, Chief Judge:

Plaintiff Edith Windsor sued as surviving spouse of a same-sex couple that was married in Canada in 2007 and was resident in New York at the time of her spouse's death in 2009. Windsor was denied the benefit of the spousal deduction for federal estate taxes under 26 U.S.C. § 2056(A) solely because Section 3 of the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7, defines the words "marriage" and "spouse" in federal law in a way that bars the Internal Revenue Service from recognizing Windsor as a spouse or the couple as married. The text of § 3 is as follows:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7. At issue is Windsor's claim for a refund in the amount of $363,053, which turns on the constitutionality of that section of federal law.

For the reasons that follow we hold that:

**I.** Windsor has standing in this action because we predict that New York, which did not permit same-sex marriage to be licensed until 2011, would nevertheless have

9

recognized Windsor and Thea Clara Spyer as married at the time of Spyer's death in 2009, so that Windsor was a surviving spouse under New York law.

**II.** Windsor's suit is not foreclosed by Baker v. Nelson, 409 U.S. 810 (1971), which held that the use of the traditional definition of marriage for a state's own regulation of marriage status did not violate equal protection.

**III.** Section 3 of DOMA is subject to intermediate scrutiny under the factors enumerated in City of Cleburn v. Cleburn Living Center, 473 U.S. 431 (1985), and other cases.

**IV.** The statute does not withstand that review.

**\* \* \***

On June 6, 2012, the United States District Court for the Southern District of New York (Jones, J.) granted summary judgment in favor of Windsor in a thorough opinion. Windsor v. United States, 833 F. Supp. 2d 394 (S.D.N.Y. 2012). The court ruled that Section 3 of DOMA violated the equal protection because there was no rational basis to support it. Id. at 406. "We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmoving party." Church of

10

*American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 203 (2d Cir. 2004).

A preliminary issue concerning alignment of the parties on appeal has been presented by motion. The United States, initially named as the sole defendant, conducted its defense of the statute in the district court up to a point. On February 23, 2011, three months after suit was filed, the Department of Justice declined to defend the Act thereafter, and members of Congress took steps to support it. The Bipartisan Legal Advisory Group of the United States House of Representatives ("BLAG") retained counsel and since then has taken the laboring oar in defense of the statute. The United States remained active as a party, switching sides to advocate that the statute be ruled unconstitutional.

Following the district court's decision, BLAG filed a notice of appeal, as did the United States in its role as nominal defendant. BLAG moved this Court at the outset to strike the notice of appeal filed by the United States and to realign the appellate parties to reflect that the United States prevailed in the result it advocated in the district court. The motion is denied. Notwithstanding the withdrawal of its advocacy, the United States continues to

11

enforce Section 3 of DOMA, which is indeed why Windsor does not have her money. The constitutionality of the statute will have a considerable impact on many operations of the United States. See INS v. Chadha, 462 U.S. 919, 931 (1983) ("When an agency of the United States is a party to a case in which the Act of Congress it administers is held unconstitutional, it is an aggrieved party for purposes of taking an appeal . . . . The agency's status as an aggrieved party . . . is not altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional.").

**DISCUSSION**

**I**

For the purpose of federal estate taxes, the law of the state of domicile ordinarily determines whether two persons were married at the time of death. Eccles v. Comm'r, 19 T.C. 1049, 1051, 1053-54 (1953); Rev. Rul. 58-66, 1958-1 C.B. 60 ("The marital status of individuals as determined under state law is recognized in the administration of the Federal income tax laws."). At the time of Spyer's death in 2009, New York did not yet license same-sex marriage itself.

A separate question--decisive for standing in this case--is whether in 2009 New York recognized same-sex marriages entered into in other jurisdictions. That question was presented to the New York Court of Appeals in Godfrey v. Spano, 13 N.Y.3d 358 (2009). However, the court was able to resolve that case on other grounds, finding "it unnecessary to reach defendants' argument that New York's common-law marriage recognition rule is a proper basis for the challenged recognition of out-of-state same-sex marriages." Id. at 377.

When we are faced with a question of New York law that is decisive but unsettled, we may "predict" what the state's law is, consulting any rulings of its intermediate appellate courts and trial courts, or we may certify the question to the New York Court of Appeals. See State Farm Mut. Auto. Ins. Co. v. Madella, 372 F.3d 500, 505 (2d Cir. 2004). BLAG urges that we certify this question, observing that this is an option that we have and that the district court did not. We decline to certify.

First, the Court of Appeals has signaled its disinclination to decide this very question. When it elected to decide Godfrey on an alternative sufficient

13

ground, the Court of Appeals expressed a preference and expectation that the issue would be decided by the New York legislature: "[w]e . . . hope that the Legislature will address this controversy." Godfrey, 13 N.Y.3d at 377. We hesitate to serve up to the Court of Appeals a question that it is reluctant to answer for a prudential reason.

Second, rulings of New York's intermediate appellate courts are useful and unanimous on this issue. It is a "well-established principle that the ruling of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Statharos v. New York City Taxi and Limousine Comm'n, 198 F.3d 317, 321 (2d Cir. 1999) (internal quotation marks and ellipsis omitted). Three of New York's four appellate divisions have concluded that New York recognized foreign same-sex marriages before the state passed its marriage statute in 2011. See In re Estate of Ranftle, 81 A.D.3d 566 (1st Dep't 2011) (Windsor's home Department, recognizing a 2008 Canadian marriage); Lewis v. N.Y. State Dep't of Civil Serv., 872 N.Y.S.2d 578 (3rd Dep't 2009),

14

aff'd on other grounds sub nom. Godfrey, 13 N.Y.3d 358; Martinez v. Cnty. of Monroe, 850 N.Y.S.2d 740 (4th Dep't 2008). Two of these cases, Lewis and Martinez, were decided *before* Spyer died on February 5, 2009. Given the consistent view of these decisions, we see no need to seek guidance here. Because Windsor's marriage would have been recognized under New York law at the time of Spyer's death, she has standing.

## II

In Baker v. Nelson, an appeal from a Minnesota Supreme Court decision finding no right to same-sex marriage, the Supreme Court issued a summary dismissal "for want of a substantial federal question." 409 U.S. 810 (1971). The Minnesota Supreme Court had held that "[t]he equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry." Baker v. Nelson, 291 Minn. 310, 313 (Minn. 1971). According to BLAG, Baker compels the inference that Congress may prohibit same-sex marriage in the same way under federal law without offending the Equal Protection Clause. We disagree.

15

"The Supreme Court has long recognized that the precedential value of a summary dismissal is limited to 'the precise issues presented and necessarily decided by' the dismissal." Alexander v. Cahill, 598 F.3d 79, 89 n.7 (2d Cir. 2010) (quoting Mandell v. Bradley, 432 U.S. 173, 176 (1977)). The question whether the federal government may constitutionally define marriage as it does in Section 3 of DOMA is sufficiently distinct from the question in Baker: whether same-sex marriage may be constitutionally restricted by the *states*. After all, Windsor and Spyer were actually married in this case, at least in the eye of New York, where they lived. Other courts have likewise concluded that Baker does not control equal protection review of DOMA for these reasons.[1]

---

[1] See Massachusetts v. U.S. Dep't of HHS, 682 F.3d 1, 8 (1st Cir. 2012) (finding that Baker permitted equal protection review so long as arguments did not "rest on a constitutional right to same-sex marriage"); Windsor, 833 F. Supp. 2d at 399-400 ("The case before the Court does not present the same issue as that presented in Baker. . . . Accordingly, after comparing the issues in Baker and those in the instant case, the Court does not believe that Baker 'necessarily decided' the question of whether DOMA violates the Fifth Amendment's Equal Protection Clause."); Pedersen v. Office of Pers. Mmgmt., No. 3:10-cv-1750, 2012 WL 3113883, at *11 (D. Conn. July 31, 2012) ("DOMA impacts federal benefits and obligations, but does not prohibit a state from authorizing or forbidding same-sex marriage, as was the case in Baker."); Golinski v. U.S. Office of Pers. Mgmt., 824 F. Supp. 2d 968, 982 n.5

16

Even if Baker might have had resonance for Windsor's case in 1971, it does not today. "'[I]nferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so *except when doctrinal developments indicate otherwise.*'" Hicks v. Miranda, 422 U.S. 332, 344 (1975) (quoting Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth., 387 F.2d 259, 263 n.3 (2d Cir. 1967) (Friendly, J.)) (emphasis added). In the forty years after Baker, there have been manifold changes to the Supreme Court's equal protection jurisprudence.

When Baker was decided in 1971, "intermediate scrutiny" was not yet in the Court's vernacular. See Craig v. Boren, 429 U.S. 190, 218 (1976) (Rehnquist, J., dissenting) (coining "intermediate level scrutiny"). Classifications

_____

(N.D. Cal. 2012) ("The failure of the federal government to recognize Ms. Golinski's marriage and to provide benefits does not alter the fact that she is married under state law."); Dragovich v. U.S. Dept. of Treasury, No. 4:10-cv-01564-CW, 2012 WL 1909603, at *6-7 (N.D. Cal. May 24, 2012); Smelt v. Cnty of Orange, 374 F. Supp. 2d. 861, 872-74 (C.D. Cal. 2005), vacated in part on other grounds, 447 F.3d 673 (9th Cir. 2006); In re Kandu, 315 B.R. 123, 135-38 (Bankr. W.D. Wash. 2004); see also Perry v. Brown, 671 F.3d 1052, 1082 n. 14 (9th Cir. 2012) (finding that Baker did not preempt consideration of Proposition 8 case, because "the question of the constitutionality of a *state's* ban on same-sex marriage" was not before the court) (emphasis added).

17

based on illegitimacy and sex were not yet deemed quasi-suspect.  See Lalli v. Lalli, 439 U.S. 259, 264-65, 275 (1982) (applying intermediate scrutiny to a classification based on illegitimacy, and describing how heightened scrutiny had been used for such classifications starting in 1976); Frontiero v. Richardson, 411 U.S. 677, 682 (1973) (plurality opinion) (identifying sex as a suspect class); Boren, 429 U.S. at 197-98 (applying intermediate scrutiny to a classification based on sex); United States v. Virginia, 518 U.S. 515, 575 (1996) (Scalia, J., dissenting) (summarizing that sex-based classifications were analyzed with rational basis review before the 1970's).[2]  The Court had not yet ruled that "a classification of [homosexuals] undertaken for its own sake" actually lacked a rational basis.  Romer v. Evans, 517 U.S. 620, 635 (1996).  And, in 1971, the government could lawfully "demean [homosexuals'] existence or control their destiny by making their private sexual conduct a crime."  Lawrence v. Texas, 539 U.S. 558, 574, 578 (2003) (noting that there was a "tenable" equal

---

[2] While other classifications have been deemed quasi-suspect or suspect over the years, the decisions to add sex and illegitimacy are especially helpful in analyzing whether the classification made in DOMA merits intermediate scrutiny.

18

protection argument against such laws, but choosing instead to overturn <u>Bowers v. Hardwick</u>, 478 U.S. 186 (1986)).  These doctrinal changes constitute another reason why <u>Baker</u> does not foreclose our disposition of this case.

The First Circuit has suggested in dicta that recognition of a new suspect classification in this context would "imply[] an overruling of <u>Baker</u>."  <u>See</u> <u>Massachusetts</u>, 682 F.3d at 9.  We disagree for two reasons that the First Circuit did not discuss.  First, when it comes to marriage, legitimate regulatory interests of a state differ from those of the federal government.  Regulation of marriage is "an area that has long been regarded as a virtually exclusive province of the States."  <u>Sosna v. Iowa</u>, 419 U.S. 393, 404 (1975).  It has for very long been settled that "[t]he State . . . has [the] absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved."  <u>Pennoyer v. Neff</u>, 95 U.S. 714, 734-35 (1878), <u>overruled on other grounds by Shaffer v. Heitner</u>, 433 U.S. 186 (1977).  Therefore, our heightened scrutiny analysis of DOMA's marital classification under federal law is distinct from the analysis necessary to determine whether the marital classification of a state would survive such scrutiny.

19

Second, the Supreme Court's decision to apply rational basis review in <u>Romer</u> does not imply to us a refusal to recognize homosexuals as a quasi-suspect class. <u>See</u> <u>Massachusetts</u>, 682 F.3d at 9. The litigants in <u>Romer</u> had abandoned their quasi-suspect argument after the trial court decision. <u>See Romer</u>, 517 U.S. at 640 n.1 (Scalia, <u>J.</u>, dissenting). We are satisfied, for these reasons, that <u>Baker</u> has no bearing on this case.

**III**

"In deciding an equal protection challenge to a statute that classifies persons for the purpose of receiving [federal] benefits, we are required, so long as the classifications are not suspect or quasi-suspect and do not infringe fundamental constitutional rights, to uphold the legislation if it bears a rational relationship to a legitimate governmental objective." <u>Thomas v. Sullivan</u>, 922 F.2d 132, 136 (2d Cir. 1990). Of course, "'a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* government interest.'" <u>Romer v. Evans</u>, 517 U.S. 620, 634-35 (1996) (quoting <u>Dep't. of Agric. v. Moreno</u>, 413 U.S. 528, 534 (1973)). So while rational basis review is indulgent and respectful, it is not

20

meant to be "toothless." <u>Schweiker v. Wilson</u>, 450 U.S. 221, 234 (1981) (quoting <u>Mathews v. Lucas</u>, 427 U.S. 495, 510 (1976)).

The district court ruled that DOMA violated the Equal Protection Clause for want of a rational basis. <u>Windsor</u>, 833 F. Supp. 2d at 406. But the existence of a rational basis for Section 3 of DOMA is closely argued. BLAG and its amici proffer several justifications that alone or in tandem are said to constitute sufficient reason for the enactment. Among these reasons are protection of the fisc, uniform administration of federal law notwithstanding recognition of same-sex marriage in some states but not others, the protection of traditional marriage generally, and the encouragement of "responsible" procreation.

Windsor and her amici vigorously argue that DOMA is not rationally related to any of these goals. Rational basis review places the burden of persuasion on the party challenging a law, who must disprove "'every conceivable basis which might support it.'" <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993) (quoting <u>Lehnhausen v. Lake Shore Auto Parts Co.</u>, 410 U.S. 356, 364 (1973)). So a party urging the absence of any rational basis takes up a heavy load. That would seem to be true in this case--the law was passed by

21

overwhelming bipartisan majorities in both houses of Congress; it has varying impact on more than a thousand federal laws; and the definition of marriage it affirms has been long-supported and encouraged.

On the other hand, several courts have read the Supreme Court's recent cases in this area to suggest that rational basis review should be more demanding when there are "historic patterns of disadvantage suffered by the group adversely affected by the statute."  See Massachusetts, 682 F.3d at 10-11; Able v. U.S., 155 F.3d 628, 634 (2d Cir. 1998); United States v. Then, 56 F.3d 464, 468 (2d Cir. 1995) (Calabresi, J., concurring).  Proceeding along those lines, the district court in this case and the First Circuit in Massachusetts both adopted more exacting rational basis review for DOMA.  See Massachusetts, 682 F.3d at 11 (describing its "more careful assessment"); Windsor, 833 F. Supp. 2d at 402 (noting that "rational basis analysis can vary by context").  At argument, counsel for BLAG wittily characterized this form of analysis as "rational basis plus or intermediate scrutiny minus."  Oral Arg. Tr. 16:10-12.

The Supreme Court has not expressly sanctioned such modulation in the level of rational basis review; discussion pro and con has largely been confined to concurring and

dissenting opinions.[3] We think it is safe to say that there is some doctrinal instability in this area.

Fortunately, no permutation of rational basis review is needed if heightened scrutiny is available, as it is in this case. We therefore decline to join issue with the dissent, which explains why Section 3 of DOMA may withstand rational basis review.

---

[3] *Compare* Lawrence, 539 U.S. at 580 (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.") *and* U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 188 (1980) (Brennan, J., dissenting) ("In other cases, however, the courts must probe more deeply.") *with* City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 459-60 (1985) (Marshall, J., concurring in part and dissenting in part) ("The refusal to acknowledge that something more than minimum rationality review is at work here is, in my view, unfortunate . . . . [B]y failing to articulate the factors that justify today's 'second order' rational-basis review, the Court provides no principled foundation for determining when more searching inquiry is to be invoked. Lower courts are thus left in the dark on this important question, and this Court remains unaccountable for its decisions employing, or refusing to employ, particularly searching scrutiny.") *and* Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 321 (1976) (Marshall, J., dissenting) ("[T]he Court has rejected, albeit Sub silentio, its most deferential statements of the rationality standard in assessing the validity under the Equal Protection Clause of much noneconomic legislation."). But see U.S. R.R. Ret. Bd., 449 U.S. at 176 n.10 ("The comments in the dissenting opinion about the proper cases for which to look for the correct statement of the equal protection rational-basis standard, and about which cases limit earlier cases, are just that: comments in a dissenting opinion.").

Instead, we conclude that review of Section 3 of DOMA requires heightened scrutiny. The Supreme Court uses certain factors to decide whether a new classification qualifies as a quasi-suspect class. They include: A) whether the class has been historically "subjected to discrimination," Bowen v. Gilliard, 483 U.S. 587, 602 (1987); B) whether the class has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society," Cleburne, 473 U.S. at 440-41; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group;" Bowen, 483 U.S. at 602; and D) whether the class is "a minority or politically powerless." Id. Immutability and lack of political power are not strictly necessary factors to identify a suspect class. See Cleburne, 473 U.S. at 442 n.10 ("'[T]here's not much left of the immutability theory, is there?'") (quoting J. Ely, Democracy and Distrust 150 (1980)); Cleburne, 473 U.S. at 472 n.24 (Marshall, J., concurring in part and dissenting in part) ("The 'political powerlessness' of a group may be relevant, but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates."); Nyquist v. Mauclet, 432 U.S. 1, 9

24

n.11 (1977) (rejecting the argument that alienage did not deserve strict scrutiny because it was not immutable); see also Pedersen, 2012 WL 3113883, at *13; Golinski, 824 F. Supp. 2d at 983; Kerrigan v. Comm'r of Pub. Health, 289 Conn. 135, 167-68 (2008). Nevertheless, immutability and political power are indicative, and we consider them here. In this case, all four factors justify heightened scrutiny: A) homosexuals as a group have historically endured persecution and discrimination; B) homosexuality has no relation to aptitude or ability to contribute to society; C) homosexuals are a discernible group with non-obvious distinguishing characteristics, especially in the subset of those who enter same-sex marriages; and D) the class remains a politically weakened minority.

**A)   History of Discrimination**

It is easy to conclude that homosexuals have suffered a history of discrimination.  Windsor and several amici labor to establish and document this history, but we think it is not much in debate.  Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal.  These laws had the imprimatur of the Supreme Court.  See Bowers, 478 U.S. at

196; see also Lawrence, 539 U.S. at 578 (noting that such laws "demean[ed homosexuals'] existence [and] control[led] their destiny").

BLAG argues that discrimination against homosexuals differs from that against racial minorities and women because "homosexuals as a class have never been politically disenfranchised."  True, but the difference is not decisive. Citizens born out of wedlock have never been inhibited in voting; yet the Supreme Court has applied intermediate scrutiny in cases of illegitimacy.  See generally Lalli v. Lalli, 439 U.S. 259 (1982).  Second, BLAG argues that, unlike protected classes, homosexuals have not "suffered discrimination for longer than history has been recorded." But whether such discrimination existed in Babylon is neither here nor there.  BLAG concedes that homosexuals have endured discrimination in this country since at least the 1920s.  Ninety years of discrimination is entirely sufficient to document a "history of discrimination."  See Pedersen, 2012 WL 3113883 at *21 (summarizing that "the majority of cases which have meaningfully considered the question [have] likewise held that homosexuals as a class have experienced a long history of discrimination").

**B)  Relation to Ability**

Also easy to decide in this case is whether the class characteristic "frequently bears [a] relation to ability to perform or contribute to society." Cleburne, 473 U.S. at 440-41; see Frontiero, 411 U.S. at 686 ("[W]hat differentiates sex from such non-suspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society."). In Cleburne, the Supreme Court ruled that heightened scrutiny was inappropriate because "those who are mentally retarded have a reduced ability to cope with and function in the everyday world." 473 U.S. at 442. The Court employed similar reasoning with respect to age classifications, finding that heightened scrutiny was not appropriate for mandatory retirement laws because "physical ability generally declines with age" and such requirements reasonably "serve[d] to remove from . . . service those whose fitness for uniformed work presumptively has diminished with age." Murgia, 427 U.S. at 316.

There is no such impairment here. There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability

27

to contribute to society, at least in some respect. But homosexuality is not one of them. The aversion homosexuals experience has nothing to do with aptitude or performance.

We do not understand BLAG to argue otherwise. Rather, BLAG suggests that the proper consideration is whether "the classification turns on 'distinguishing characteristics relevant to interests the State has the authority to implement,'" quoting Cleburne, 473 U.S. at 441. Thus, BLAG urges that same-sex couples have a diminished ability to discharge family roles in procreation and the raising of children. BLAG cites no precedential application of that standard to support its interpretation, and it is inconsistent with actual cases. See, e.g., Frontiero, 411 U.S. at 686 (distinguishing that sex, unlike intelligence, has no bearing on one's general ability to contribute to society). In any event, the abilities or inabilities cited by BLAG bear upon whether the law withstands scrutiny (the second step of analysis) rather than upon the level of scrutiny to apply. Cf. Clark v. Jeter, 486 U.S. 456, 461 (1988) (defining the test for intermediate scrutiny as whether a classification is "substantially related to an important government interest").

## C) Distinguishing Characteristic

We conclude that homosexuality is a sufficiently discernible characteristic to define a discrete minority class.  See Rowland v. Mad River Local School Dist., Montgomery County, Ohio, 470 U.S. 1009, 1014 (1985) (Brennan, J., dissenting from denial of certiorari) ("[H]omosexuals constitute a significant and insular minority of this country's population.").

This consideration is often couched in terms of "immutability."  BLAG and its amici argue that sexual orientation is not necessarily fixed, suggesting that it may change over time, range along a continuum, and overlap (for bisexuals).  But the test is broader: whether there are "obvious, immutable, *or* distinguishing characteristics that define . . . a discrete group."  See Bowen, 483 U.S. at 602 (emphasis added).  No "obvious badge" is necessary.  See Mathews v. Lucas, 427 U.S. 495, 506 (1976).  Classifications based on alienage, illegitimacy, and national origin are all subject to heightened scrutiny, Cleburne, 473 U.S. at 440-41, even though these characteristics do not declare themselves, and often may be disclosed or suppressed as a

matter of preference.[4]  What seems to matter is whether the characteristic of the class calls down discrimination when it is manifest.

Thus a person of illegitimate birth may keep that status private, and ensure that no outward sign discloses the status in social settings or in the workplace, or on the subway.  But when such a person applies for Social Security benefits on the death of a parent (for example), the illegitimate status becomes manifest.  The characteristic is necessarily revealed in order to exercise a legal right.  Similarly, sexual preference is necessarily disclosed when

---

[4] Alienage and illegitimacy are actually subject to change.  See Pedersen, 2012 WL 3113883 at *23 ("The Supreme Court has held that resident aliens constitute a suspect class despite the ability to opt out of the class voluntarily.  Additionally, one's status as illegitimate may be subject to change and is therefore not a strictly immutable characteristic.") (internal citation omitted); see also Watkins v. U.S. Army, 875 F.2d 699, 726 (9th Cir. 1989) (Norris, J., concurring) ("It is clear that by 'immutability' the [Supreme] Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class.  People can have operations to change their sex. Aliens can ordinarily become naturalized citizens.  The status of illegitimate children can be changed. People can frequently hide their national origin by changing their customs, their names, or their associations. . . . At a minimum, then, the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.").

two persons of the same sex apply for a marriage license (as they are legally permitted to do in New York), or when a surviving spouse of a same-sex marriage seeks the benefit of the spousal deduction (as Windsor does here).

BLAG argues that a classification based on sexual orientation would be more "amorphous" than discrete. It may be that the category exceeds the number of persons whose sexual orientation is *outwardly* "obvious, immutable, or distinguishing," and who thereby predictably undergo discrimination. But that is surely also true of illegitimacy and national origin. Again, what matters here is whether the characteristic invites discrimination when it is manifest.

The class affected by Section 3 of DOMA is composed entirely of persons of the same sex who have married each other. Such persons constitute a subset of the larger category of homosexuals; but as counsel for BLAG conceded at argument, there is nothing amorphous, capricious, or tentative about their sexual orientation. Oral Arg. Tr. 12:11-14. Married same-sex couples like Windsor and Spyer are the population most visible to the law, and they are foremost in mind when reviewing DOMA's constitutionality.

We therefore conclude that sexual orientation is a sufficiently distinguishing characteristic to identify the discrete minority class of homosexuals.

**D)  Political Power**

Finally, we consider whether homosexuals are a politically powerless minority.  See Bowen, 483 U.S. at 602. Without political power, minorities may be unable to protect themselves from discrimination at the hands of the majoritarian political process.  We conclude that homosexuals are still significantly encumbered in this respect.

The question is not whether homosexuals have achieved political successes over the years; they clearly have.  The question is whether they have the strength to politically protect themselves from wrongful discrimination.  When the Supreme Court ruled that sex-based classifications were subject to heightened scrutiny in 1973, the Court acknowledged that women had already achieved major political victories.  See Frontiero, 411 U.S. at 685.  The Nineteenth Amendment had been ratified in 1920, and Title VII had already outlawed sex-based employment.  See 78 Stat. 253. The Court was persuaded nevertheless that women still lacked adequate political power, in part because they were "vastly

32

underrepresented in this Nation's decisionmaking councils," including the presidency, the Supreme Court, and the legislature. <u>Frontiero</u>, 411 U.S. at 686 n.17.

There are parallels between the status of women at the time of <u>Frontiero</u> and homosexuals today: their position "has improved markedly in recent decades," but they still "face pervasive, although at times more subtle, discrimination . . . in the political arena." <u>Frontiero</u>, 411 U.S. at 685-86. It is difficult to say whether homosexuals are "under-represented" in positions of power and authority without knowing their number relative to the heterosexual population. But it is safe to say that the seemingly small number of acknowledged homosexuals so situated is attributable either to a hostility that excludes them or to a hostility that keeps their sexual preference private--which, for our purposes, amounts to much the same thing. Moreover, the same considerations can be expected to suppress some degree of political activity by inhibiting the kind of open association that advances political agendas. <u>See</u> <u>Rowland</u>, 470 U.S. at 1014 (Brennan, <u>J.</u>, dissenting from denial of certiorari) ("Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly

33

powerless to pursue their rights openly in the political arena.").

In sum, homosexuals are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public.

* * *

Analysis of these four factors supports our conclusion that homosexuals compose a class that is subject to heightened scrutiny.  We further conclude that the class is quasi-suspect (rather than suspect) based on the weight of the factors and on analogy to the classifications recognized as suspect and quasi-suspect.  While homosexuals have been the target of significant and long-standing discrimination in public and private spheres, this mistreatment "is not sufficient to require 'our most exacting scrutiny.'" Trimble v. Gordon, 430 U.S. 762, 767 (1977) (quoting Mathews v. Lucas, 427 U.S. 495, 506 (1976)).

The next step is to determine whether DOMA survives intermediate scrutiny review.


**IV**

To withstand intermediate scrutiny, a classification must be "substantially related to an important government

34

interest." Clark v. Jeter, 486 U.S. 456, 461 (1988). "Substantially related" means that the explanation must be "'exceedingly persuasive.'" United States v. Virginia, 518 U.S. 515, 533 (1996) (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation." Id.

BLAG advances two primary arguments for why Congress enacted DOMA. First, it cites "unique federal interests," which include maintaining a consistent federal definition of marriage, protecting the fisc, and avoiding "the unknown consequences of a novel redefinition of a foundational social institution." Second, BLAG argues that Congress enacted the statute to encourage "responsible procreation." At argument, BLAG's counsel all but conceded that these reasons for enacting DOMA may not withstand intermediate scrutiny. Oral Arg. Tr. 16:24-17:6.

**A)   Maintaining a "Uniform Definition" of Marriage**

Statements in the Congressional Record express an intent to enforce uniform eligibility for federal marital benefits by insuring that same-sex couples receive--or

35

lose--the same federal benefits across all states.[5]

However, the emphasis on uniformity is suspicious because Congress and the Supreme Court have historically deferred to state domestic relations laws, irrespective of their variations.

To the extent that there has ever been "uniform" or "consistent" rule in federal law concerning marriage, it is that marriage is "a virtually exclusive province of the States." Sosna, 419 U.S. at 404. As the Supreme Court has emphasized, "the states, at the time of the adoption of the Constitution, possessed *full power* over the subject of marriage and divorce. . . . [T]he Constitution delegated *no authority* to the Government of the United States on the subject of marriage and divorce." Haddock v. Haddock, 201 U.S. 562, 575 (1906) (emphasis added), overruled on other grounds by Williams v. State of North Carolina, 317 U.S. 287 (1942). DOMA was therefore an unprecedented intrusion "into an area of traditional state regulation." Massachusetts, 682 F.3d at 13. This is a reason to look upon Section 3 of

---

[5] For example, certain legislators were concerned that it would be administratively difficult to deal with benefit changes as same-sex couples moved between states with different policies on same-sex marriage. See, e.g., 150 Cong. Rec. 15318 (2004) (Sen. Inhofe).

DOMA with a cold eye. "The absence of precedent . . . is itself instructive; '[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" Romer v. Evans, 517 U.S. 620, 633 (1996) (quoting Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 37-38 (1928)).

Moreover, DOMA's sweep arguably creates more discord and anomaly than uniformity, as many amici observe. Because DOMA defined only a single aspect of domestic relations law, it left standing all other inconsistencies in the laws of the states, such as minimum age, consanguinity, divorce, and paternity. See Br. of Amici Curiae Family Law Professors Supporting Petitioner at 12-13 (noting that "the federal government has always accepted the states' different ways of defining parental status" and offering numerous examples of critical differences in state parental policies).

The uniformity rationale is further undermined by inefficiencies that it creates. As a district court in this Circuit found, it was simpler--and more consistent--for the federal government to ask whether a couple was married under the law of the state of domicile, rather than adding "an additional criterion, requiring the federal government to

37

identify and exclude all same-sex marital unions from federal recognition." Pedersen, 2012 WL 3113883 at *48; see Golinski, 824 F. Supp. 2d at 1001-02 ("The passage of DOMA actually undermined administrative consistency by requiring that the federal government, for the first time, discern which state definitions of marriage are entitled to federal recognition and which are not.").

Because DOMA is an unprecedented breach of longstanding deference to federalism that singles out same-sex marriage as the only inconsistency (among many) in state law that requires a federal rule to achieve uniformity, the rationale premised on uniformity is not an exceedingly persuasive justification for DOMA.

**B)  Protecting the Fisc**

Another professed goal of Congress is to save government resources by limiting the beneficiaries of government marital benefits.  H.R. Rep. No. 104-664, at 18 (1996), reprinted in 1996 U.S.C.C.A.N. 2905, 2922.  Fiscal prudence is undoubtedly an important government interest. Windsor and certain amici contest whether the measure will achieve a net benefit to the Treasury; but in matters of the federal budget, Congress has the prerogative to err (if error it is), and cannot be expected to prophesy the future

38

accurately. But the Supreme Court has held that "[t]he saving of welfare costs cannot justify an otherwise invidious classification." Graham v. Richardson, 403 U.S. 365, 375 (1971) (quotation marks omitted). As the district court observed, "excluding any arbitrarily chosen group of individuals from a government program conserves government resources." Windsor, 833 F. Supp. 2d at 406 (quotation marks).

Citing Bowen v. Owens, 476 U.S. 340, 348 (1986), BLAG draws the distinction that DOMA did not *withdraw* benefits from same-sex spouses; since DOMA was enacted before same-sex marriage was permitted in any state, DOMA operated to prevent the *extension* of benefits to people who never enjoyed them. However, Bowen was decided on rational basis grounds and did not involve an invidious classification. Id. at 349-50. Moreover, DOMA is properly considered a benefit withdrawal in the sense that it functionally eliminated longstanding federal recognition of all marriages that are properly ratified under state law--and the federal benefits (and detriments) that come with that recognition.

Furthermore, DOMA is so broad, touching more than a thousand federal laws, that it is not substantially related to fiscal matters. As amicus Citizens for Responsibility

39

and Ethics in Washington demonstrates, DOMA impairs a number of federal laws (involving bankruptcy and conflict-of-interest) that have nothing to do with the public fisc. <u>See</u> Br. of Amicus Curiae Citizens for Responsibility and Ethics in Washington at 5-11, 18-23. DOMA transcends a legislative intent to conserve public resources.

For these reasons, DOMA is not substantially related to the important government interest of protecting the fisc.

**C) Preserving a Traditional Understanding of Marriage**

Congress undertook to justify DOMA as a measure for preserving traditional marriage as an institution. 150 Cong. Rec. 14951. But "[a]ncient lineage of a legal concept does not give [a law] immunity from attack for lacking a rational basis." <u>Heller</u>, 509 U.S. at 326. <u>A fortiori</u>, tradition is hard to justify as meeting the more demanding test of having a substantial relation to an important government interest. Similar appeals to tradition were made and rejected in litigation concerning anti-sodomy laws. <u>See</u> <u>Lawrence</u>, 539 U.S. at 577-78 ("'[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; *neither history nor tradition* could save a law prohibiting

40

miscegenation from constitutional attack.'") (quoting

Bowers, 478 U.S. at 216 (Stevens, J., dissenting)) (emphasis added).

Even if preserving tradition were in itself an important goal, DOMA is not a means to achieve it.  As the district court found: "because the decision of whether same-sex couples can marry is left to the states, DOMA does not, strictly speaking, 'preserve' the institution of marriage as one between a man and a woman."  Windsor, 833 F. Supp. at 403.

Preservation of a traditional understanding of marriage therefore is not an exceedingly persuasive justification for DOMA.

**D)   Encouraging Responsible Procreation**

Finally, BLAG presents three related reasons why DOMA advances the goals of "responsible childrearing":  DOMA subsidizes procreation because only opposite-sex couples can procreate "naturally"; DOMA subsidizes biological parenting (for more or less the same reason); and DOMA facilitates the optimal parenting arrangement of a mother and a father.  We agree that promotion of procreation can be an important government objective.  But we do not see how DOMA is substantially related to it.

41

All three proffered rationales have the same defect: they are cast as incentives for heterosexual couples, incentives that DOMA does not affect in any way. DOMA does not provide any incremental reason for opposite-sex couples to engage in "responsible procreation."[6] Incentives for opposite-sex couples to marry and procreate (or not) were the same after DOMA was enacted as they were before.[7] Other courts have likewise been unable to find even a *rational* connection between DOMA and encouragement of responsible procreation and child-rearing. See Massachusetts, 682 F.3d at 14-15 (underscoring the "lack of any demonstrated connection between DOMA's treatment of same-sex couples and its asserted goal of strengthening the bonds and benefits to society of heterosexual marriage") (citations omitted); Windsor, 833 F. Supp. at 404-05; Pedersen, 2012 WL 3113883, at *40-43.

---

[6] "[T]he argument that withdrawing the designation of 'marriage' from same-sex couples could on its own promote the strength or stability of opposite-sex marital relationships lacks any such footing in reality." Perry v. Brown, 671 F.3d 1052, 1089 (9th Cir. 2012).

[7] To the extent that BLAG is suggesting that Congress' laws might actually *influence* sexual orientation, there is no evidence to support that claim (and it strikes us as far-fetched).

DOMA is therefore not substantially related to the important government interest of encouraging procreation.

**\*\*\***

DOMA's classification of same-sex spouses was not substantially related to an important government interest. Accordingly, we hold that Section 3 of DOMA violates equal protection and is therefore unconstitutional.

## V

Our straightforward legal analysis sidesteps the fair point that same-sex marriage is unknown to history and tradition. But law (federal *or* state) is not concerned with holy matrimony. Government deals with marriage as a civil status--however fundamental--and New York has elected to extend that status to same-sex couples. A state may enforce and dissolve a couple's marriage, but it cannot sanctify or bless it. For that, the pair must go next door.

## CONCLUSION

For the foregoing reasons, we AFFIRM the grant of Windsor's motion for summary judgment.

STRAUB, *Circuit Judge*, dissenting in part and concurring in part:

**INTRODUCTION**

I respectfully dissent in part and concur in part.

I concur with those parts of the majority opinion that (1) deny BLAG's motion to dismiss the appeal taken by the United States, and (2) decline to certify to the New York Court of Appeals the question of whether the State of New York recognized Windsor's marriage at the time of her wife's death. For the reasons that follow, I dissent from the majority's holding that DOMA is unconstitutional under the Fifth Amendment's equal protection guarantee.

The majority holds DOMA unconstitutional, a federal law which formalizes the understanding of marriage in the federal context extant in the Congress, the Presidency, and the Judiciary at the time of DOMA's enactment and, I daresay, throughout our nation's history. If this understanding is to be changed, I believe it is for the American people to do so.

Forty years ago, the United States Supreme Court was presented with the essentially identical challenge we have here. The then DOMA-like Minnesota law was upheld in that state's highest court because it found that the right to marry without regard to sex was not a fundamental right and the law's thrust was not irrational or invidious discrimination. The Supreme Court of Minnesota held that the applicable Minnesota statute defining marriage as a union between a man and a woman did not violate the United States Constitution. Upon their appeal to the United States Supreme Court, the plaintiffs' jurisdictional statement squarely claimed that Minnesota's same-sex marriage prohibition violated their equal protection rights. The Supreme Court, in dismissing the appeal for "want of a substantial federal question," obviously found no constitutional infirmity in that DOMA-like Minnesota law. I am unable to

conclude, as it is suggested we should, that the Supreme Court of the United States would have held as it did had it concluded that the Minnesota law was unconstitutional—at a time when it was required to accept the appellate challenge. The Supreme Court made a merits decision, and has never walked away from it or ever suggested that its disposition elided a merits determination on some procedural basis. It has further instructed us that such a disposition, albeit summary, rejects the challenge presented in the jurisdictional statement and is binding on the lower federal courts. And, as recently as 2003, Justice O'Connor reminded us that rational reasons exist to promote the traditional institution of marriage. *Baker* dictates my decision.

Furthermore, it is argued here that we are to disregard this binding precedent and the traditionally applicable rational basis standard of review and, instead, now create a new type of suspect classification requiring a heightened level of scrutiny in respect of the federal definition of marriage. The Supreme Court has never done so, while reminding us to be wary of creating any new such classification and itself not having created any in decades. I believe it would be imprudent to do so in this case. Eleven of our nation's federal Circuit Courts of Appeals have not utilized an elevated form of scrutiny as to sexual orientation discrimination. Most recently, the First Circuit went to the extreme of creating a new, increased level of rational basis analysis. This appears to be the first case in which this Court is asked to do the same or more, and the majority is the first to apply intermediate scrutiny to invalidate the federal definition of marriage as between a man and a woman. The discrimination in this case does not involve a recognized suspect or quasi-suspect classification. It is squarely about the preservation of the traditional institution of marriage and its procreation of children. DOMA centers on legitimate state interests that go beyond mere moral disapproval of an excluded group. DOMA's classification is

to be reviewed on the basis of whether it has a rational relation to any legitimate end. Utilizing that standard, I conclude that DOMA is constitutional. The rational basis standard is most deferential to the determinations of the Congress. Such may be conclusory and are not to be tried in the traditional fact-oriented process. The public policy choice set forth in DOMA is to be made by Congress, not the Judiciary. In DOMA, Congress has set the boundaries for marriage—all in keeping with American society's historical view of a marriage as being between a man and a woman. This is not the first time the Congress has signaled its intentions in various definitions of eligibility for federal purposes as to children, marriage, and domestic relations. These have at times conflicted with state laws but the federal law has always prevailed for federal purposes.

The Congress had the benefit of advice from the Department of Justice that DOMA is constitutional. The Congress decided to codify what had always been implicit in federal law. The history of federal legislation in respect of the meaning of marriage or spouse was never even suggested to mean anything other than the lawful union of one man and one woman for all federal purposes. The nation's traditional understanding was memorialized in DOMA. Congress explicitly sought to recognize for federal purposes the significance of our historical understanding of a mainstream value, joining the biological component of the marriage relationship to the legal responsibility of rearing the offspring of that union. The Congress referenced its intention to sanction, for federal purposes, society's desire to approve the man and woman long term union as the ideal by which to beget and rear children. Indeed, state high courts—as in New York—have credited their legislature's rational decisions to promote the welfare of children via opposite-sex marriage laws. Further, Congress has articulated, as another legitimate reason for DOMA, that the federal fisc as well as America's desired right to equitable

-3-

distribution of benefits should not be based on the particularity or peculiarity of any state's definition of marriage, but rather the federal government is entitled to codify a single definition of marriage as historically understood.

The Congress was uniform and consistent. And, it chose not to rush ahead with a redefinition at a time when all the states utilized the traditional definition of marriage. It chose to let the issue evolve within American society. The Congress accomplished its task in a manner which continues to respect the principle of federalism. The states remain free to define marriage as they choose, pursuant to DOMA. And, forty-one of our states continue to define marriage as DOMA does. The totality of the foregoing is sufficient to hold DOMA constitutional under the rational basis standard. Even the majority opinion, while ultimately holding DOMA unconstitutional under a higher level of scrutiny, appears to imply that DOMA passes rational basis review. (Maj. Op. at 22:3–9.)

My final observation relates to the Attorney General's current position. His assertion that sexual orientation is a suspect classification and that DOMA fails to pass strict scrutiny is recently minted, and is contrary to an established body of cases to the contrary. The Attorney General's position is unprecedented in its departure from the Department of Justice's long-standing policy of defending federal statutes even if the President disagrees as a matter of policy.

At bottom, the issue here is marriage at the federal level for federal purposes, and not other legitimate interests. The Congress and the President formalized in DOMA, for federal purposes, the basic human condition of joining a man and a woman in a long-term relationship and the only one which is inherently capable of producing another generation of humanity. Whether that understanding is to continue is for the American people to decide via their choices

in electing the Congress and the President. It is not for the Judiciary to search for new standards by which to negate a rational expression of the nation via the Congress.

**DISCUSSION**

*I.        The Origin and Impact of DOMA*

DOMA was enacted in 1996 in response to the possible end to the exclusion of same-sex couples from civil marriage in Hawaii. In *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), the Hawaii Supreme Court held that denying same-sex couples the right to marry must be justified under strict scrutiny, and remanded for further proceedings consistent with this determination.[1] The House Judiciary Committee's Report on DOMA (the "House Report") described *Baehr* as part of an "orchestrated legal assault being waged against traditional heterosexual marriage." *See* H.R. Rep. No. 104-664, at 2–3 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906–07 ("House Report" or "H. Rep.").

DOMA has two key provisions. Section 2, the choice-of-law section, states:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

28 U.S.C. § 1738C. This provision expresses Congress's desire to prevent a situation where one state would be forced to recognize same-sex marriages performed and recognized in a different state.

---

[1] Same-sex marriage never became law in Hawaii because, following *Baehr*, the Hawaii Constitution was amended to allow for the legislative prohibition of same-sex marriage. *See* Haw. Const. art. I, § 23. But, this did not occur until after DOMA was enacted.

Section 3, the definitional section of DOMA, provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7. This provision articulates Congressional recognition, for federal purposes, that marriage is the union of a man and a woman.

The House Report indicates that several motivations led Congress to pass DOMA. It identifies four "governmental interests advanced by this legislation: (1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality; (3) protecting state sovereignty and democratic self-governance; and (4) preserving scarce government resources." (H. Rep. at 12–18.) The House Report also justifies DOMA as a means to "encourag[e] responsible procreation and child-rearing," H. Rep. at 13, and as a way to reflect Congress's "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." (H. Rep. at 16.)

Given the broad range of federal laws to which marital status is relevant, the consequences of DOMA are far-reaching. In addition to preventing a surviving same-sex spouse like Windsor from inheriting money or property free from an estate tax, DOMA prevents same-sex married couples from lessening tax burdens by filing joint federal tax returns, *see* 26 U.S.C. § 1(a)-(c); prevents the surviving spouse of a same-sex marriage from collecting Social Security survivor benefits, *see, e.g.*, 42 U.S.C. § 402; and prevents federal employees from sharing their health insurance and certain other medical benefits with same-sex spouses. As a result of DOMA, married same-sex couples are deprived of many other, lesser-known rights, benefits, and

privileges including, *inter alia*, benefits relating to intellectual property; housing benefits; veteran's benefits; immigration entitlements (same-sex spouses are the only legally married spouses of American citizens who can face deportation); employment benefits in the private sector (including sick leave to care for one's spouse under the Family and Medical Leave Act); and protections relating to domestic and intimate partner crimes and family violence.

In sum, DOMA codifies, for purposes of federal statutes, regulations, and rulings, the understanding of marriage as "only a legal union between one man and one woman as husband and wife," *see* 1 U.S.C. § 7, and it reserves to each state the ability to retain that definition as its policy if the state so chooses, or to alter it, as it sees fit. *See* 28 U.S.C. § 1738C. In enacting DOMA, therefore, Congress (1) maintained the status quo as to the federal definition of marriage for the purposes of federal programs and benefits; and (2) recognized the right of any state to allow gays and lesbians to marry while, at the same time, permitting other states to adhere to their existing understandings of the institution of marriage.

## II. Standard of Review

We review a grant of summary judgment de novo. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

There being no dispute as to the material facts in this matter, I find, as a matter of law, that DOMA is constitutional.

### III.     *The Precedential Effect of* **Baker v. Nelson**

The majority concludes that Windsor's claim is not foreclosed by the Supreme Court's summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972).  In *Baker*, a same-sex couple seeking the right to marry challenged a Minnesota law that limited marriage to opposite-sex couples on the grounds that it violated due process and equal protection, as it unconstitutionally discriminated on the basis of sex.  *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971).  The Minnesota Supreme Court, applying rational basis review, upheld the statute because it found the right to marry without regard to sex was not fundamental, and because classifying who can marry based on sex was not "irrational or invidious discrimination."  *Id.* at 187.  The Court reasoned that "[i]t is unrealistic to think that the original draftsmen of our marriage statutes, which date from territorial days, would have used the term" to mean anything other than "the state of union between persons of the opposite sex."  *Id.* at 186.  In so doing, the Court found support in the 1966 version of Webster's Third New International Dictionary, the fourth edition of Black's Law Dictionary, the Book of Genesis, and *Skinner v. Oklahoma*, which declared that "[m]arriage and procreation are fundamental to the very existence and survival of the race."  316 U.S. 535, 541 (invalidating Oklahoma's Habitual Criminal Sterilization Act under the Fourteenth Amendment's Equal Protection Clause).

The Minnesota Supreme Court rejected petitioners' reliance on *Griswold v. Connecticut*, 381 U.S. 479 (1965), and *Loving v. Virginia*, 388 U.S. 1 (1967).  The Minnesota Supreme Court held that the privacy right recognized in *Griswold* was "inherent in the marital relationship," and

-8-

that *Loving* did not militate in favor of petitioners because "Virginia's anti-miscegenation statute . . . was invalidated solely on the grounds of its patent racial discrimination." *Id.* at 186–87. The Court concluded that in both a "commonsense and in a constitutional sense, there is a clear distinction between a martial restriction based merely upon race and one based upon the fundamental difference in sex." *Id.* at 187. The United States Supreme Court summarily dismissed the appeal of the Minnesota Supreme Court's ruling for "want of a substantial federal question." *Baker*, 409 U.S. at 810.

The equal protection guarantee of the Fifth Amendment, which applies to the federal government, functions identically to the Equal Protection Clause of the Fourteenth Amendment, which applies to the states. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). Therefore, jurisprudence interpreting one applies to the other. It follows that any ruling of the Supreme Court on a Fourteenth Amendment equal protection challenge to the denial of same-sex marriage applies with equal force to an equal protection challenge to the denial of same-sex marriage under the Fifth Amendment.

According to the jurisdictional statement of the appellants in *Baker*, the case presented, *inter alia*, the question of "[w]hether appellee's refusal, pursuant to Minnesota marriage statutes, to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment." (JA-695.) The question presented here, by Windsor, can be formulated in a strikingly similar fashion: "Whether Section 3 of the Defense of Marriage Act is consistent with the equal protection component of the Fifth Amendment Due Process Clause." (DOJ Br. at 2.)

*Baker* is a disposition on the merits, not a mere denial of certiorari, *Hicks v. Miranda*, 422 U.S. 332, 344 (1975), and any ruling inconsistent with its terms must be avoided. "[L]ower courts are bound by summary decisions by this Court until such time as the Court informs (them) that (they) are not." *Hicks*, 422 U.S. at 344–45 (internal quotation omitted).

A summary dismissal means that "the Court found that the decision below was correct and that no substantial question of the merits was raised." E. Gressman, et al., *Supreme Court Practice* § 5.18, p.365 (9th ed. 2007). *See also Roxbury Taxpayers Alliance v. Del. Cnty. Bd. of Supervisors*, 80 F.3d 42, 48 (2d Cir. 1996) (recognizing dismissal for want of a substantial federal question as "a decision on the merits of the case"); *Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 262 n.3 (2d Cir. 1967) ("[U]nless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise."); *cf. Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir. 1973) (rejecting argument that summary dispositions have "very little precedential significance" and stating that "we are bound by the Supreme Court's summary affirmances until such time as the Court informs us that we are not") (internal quotation omitted). Thus, *Baker* squarely rejected the contention that prohibiting same-sex marriages violated equal protection.[2]

Whatever factual differences exist between the challenge to the Minnesota law presented in *Baker* and Windsor's challenge to DOMA, they are too attenuated to remove the instant case from the scope of *Baker's* precedential effect. Although the facts in this case are not identical to

---

[2] 1988 legislation curtailing the Supreme Court's appellate jurisdiction did not change the precedential import of summary dispositions. "Abolition of the [mandatory] appeal jurisdiction does not change this rule." 16B Charles Alan Wright & Arthur R. Miller, et al., *Federal Practice & Procedure* § 4014 (2d ed. 2012).

those in *Baker*, the "precedential value of a dismissal for want of a substantial federal question extends beyond the facts of the particular case to all similar cases." *Wright v. Lane Cnty. Dist. Court*, 647 F.2d 940, 941 (9th Cir. 1981); *see also League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 164 (2d Cir. 1984) (the court's "responsibility in gauging [a summary disposition's] authority . . . is to mark out the 'reach and content' of that prior disposition").

The same-sex couple in *Baker* argued that Minnesota's exclusion of same-sex couples from the institution of civil marriage violated the Equal Protection Clause because it was discrimination not rationally related to any legitimate governmental interest. Forty years may have passed, but Windsor makes the same claim today (based on, *inter alia*, similar arguments regarding the over-and under-inclusiveness of the limitation on the marriage right vis-à-vis the procreation rationale). Whatever differences exist between Windsor's claim and those advanced in *Baker*, they are insignificant compared to the central fact that both cases present equal protection challenges to laws prohibiting the recognition of any marriage entered into by two persons of the same sex. Thus, any distinctions do not render DOMA sufficiently different from Minnesota's marriage law at the time of *Baker* such that it can be said the issues in this case were not before and decided by the Supreme Court. The relevant facts of this case are substantially similar to those of *Baker*, which necessarily decided that a state law defining marriage as a union between a man and woman does not violate the Equal Protection Clause. *Baker* is the last word from the Supreme Court regarding the constitutionality of a state law limiting marriage to opposite-sex couples under the Equal Protection Clause and thus remains binding on this Court,

-11-

given that the equal protection component of the Fifth Amendment is identical to and coextensive with the Fourteenth Amendment guarantee.

Since *Baker* holds that states may use the traditional definition of marriage for state purposes without violating equal protection, it necessarily follows that Congress may define marriage the same way for federal purposes without violating equal protection. *See Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 870 (8th Cir. 2006) ("In the nearly one hundred and fifty years since the Fourteenth Amendment was adopted, to our knowledge no Justice of the Supreme Court has suggested that a state statute or constitutional provision codifying the traditional definition of marriage violates the Equal Protection Clause or any other provision of the United States Constitution."); *McConnell v. Nooner*, 547 F.2d 54, 56 (8th Cir. 1976) (per curiam) (*Baker* "constitutes an adjudication on the merits which is binding on the lower federal courts"); *Adams v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980) (finding *Baker* controlling in case where same-sex spouse appealed denial of petition with INS to be classified as "immediate relative"), *aff'd*, 673 F.2d 1036, 1039 n.2 (9th Cir. 1982) (acknowledging precedential nature of *Baker*); *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1305 (M.D. Fla. 2005) (*Baker* is "binding precedent" with "dispositive effect" requiring dismissal of equal protection challenge to DOMA).

The correctness of the *Baker* holding was placed squarely before the Supreme Court in that case's jurisdictional statement. The Court's summary dismissal for want of a substantial federal question is therefore a controlling precedent, unless and until re-examined by the Supreme Court. *Hicks*, 422 U.S. at 343–45. "The Court neither acknowledges nor holds that other courts should ever conclude that its more recent cases have, by implication, overruled an earlier precedent. Rather, lower courts should follow the case which directly controls, leaving to

this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 207 (1997).[3]

The close resemblance between the issue presented in *Baker* and the claim advanced by Windsor means that the scope of *Baker* controls the question raised by this appeal, foreclosing Windsor's claim. That is, both cases involve the validity of same-sex couples' deprivation of marriage rights, a question already presented to and adjudicated on the merits by the Supreme Court. In addition, if, as *Baker* held, denying same-sex couples the right to marry does not violate equal protection, it follows that denying same-sex couples a subset of the rights (*i.e.*, federal rights) associated with marriage is also constitutional. This conclusion is inescapable. For the sake of completeness, in the event that there is any doubt that *Baker* forecloses Windsor's claim, I now proceed to consider the merits.

### IV. *Principles of Equal Protection Analysis*

"The Due Process Clause of the Fifth Amendment assures every person the equal protection of the laws, 'which is essentially a direction that all persons similarly situated should be treated alike.'" *Able v. United States*, 155 F.3d 628, 631 (2d Cir. 1998) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).

---

[3] Although we have noted that questions may stop being "insubstantial" when subsequent doctrinal developments so indicate, *Port Auth. Bondholders*, 387 F.2d at 263 n.3, the Supreme Court has never, despite the numerous developments in the last forty years, stated that its holding in *Baker* is invalid. I am not convinced by Windsor's arguments that the Supreme Court's decisions in *Romer v. Evans* and *Lawrence v. Texas* have eroded *Baker's* foundations such that it no longer holds sway.

In *Romer*, the Supreme Court applied rational basis scrutiny to laws that discriminated on the basis of sexual orientation. In *Lawrence*, the Supreme Court expressly stated that "[t]he present case does not involve . . . whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578. Consequently, there are no doctrinal changes in Supreme Court jurisprudence implying that *Baker* is no longer binding authority and *Baker's* effect therefore hinges on whether the issues in this case were presented to and necessarily decided by the Supreme Court.

When the subject of unequal treatment is a member of a class that historically has been the object of discrimination, or government conduct employs a classification—*inter alia*, race, alienage, nationality, sex, and illegitimacy—closely associated with inequality, "the Supreme Court has required a higher degree of justification than a rational basis, either strict or intermediate scrutiny. Under the strict scrutiny test the government must demonstrate a compelling need for the different treatment and that the provision in question is narrowly tailored to achieve its objective. Under intermediate scrutiny, the government must at least demonstrate that the classification is substantially related to an important governmental objective." *Id.* at 631–32 (internal citations omitted).

Where no suspect classification is employed or fundamental right infringed upon by government conduct, the constitutional guarantee of equal protection is satisfied where a classification bears a rational relationship to an appropriate governmental interest. *See Heller v. Doe*, 509 U.S. 312, 320 (1993). In evaluating whether the asserted purposes of a federal law are rationally related to its ends, we defer to the judgment of Congress. Congressional enactments that do not infringe upon a fundamental right or employ a suspect classification are entitled to "a strong presumption of validity," and must be sustained if "'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* at 319–20 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Rational basis review in an equal protection analysis does not authorize "'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Id.* at 319 (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

-14-

Unlike under heightened scrutiny, in a rational basis equal protection analysis courts look to any "conceivable basis" for the challenged law, not limited to those articulated by or even consistent with the rationales offered by the legislature. *Beach Commc'ns*, 508 U.S. at 312.[4] Those attacking the rationality of a legislative classification have the burden "to negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (internal quotation omitted). "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (footnote omitted). "[A] law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Under the rational review framework, where there are "plausible reasons" for Congressional action, a court's "inquiry is at an end." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). This standard of review is "a paradigm of judicial restraint." *Beach Commc'ns*, 508 U.S. at 314. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321. "Only by faithful adherence to th[e] guiding principle of [restraint in] judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Beach Commc'ns*, 508 U.S. at 315 (internal quotation omitted).

---

[4] Indeed, in *Beach Communications*, the Supreme Court upheld the challenged law using a posited reason for a federal agency regulation, even though Congress had previously rejected that purpose and the regulation presented a conflict in the statutory scheme. *Id.* at 318.

Having a conceivable legitimate governmental interest is, alone, not sufficient for rational basis review. To survive rational basis review, a law must also have a rational relationship to the asserted legitimate governmental interest. In assessing the existence of a rational relationship, courts should be guided by the knowledge that rational basis review is "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989).

However, even under rational basis review, a law will fail if it seeks to further an illegitimate end. For example, "the accommodation of . . . bias or animosity can never serve as a legitimate government interest; mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in the circumstances, are not permissible bases for differential treatment by the government." *Able*, 155 F.3d at 634 (internal quotations omitted). Laws that single out a certain class of citizens for disfavored legal status "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 633–34. And such animosity cannot constitute a legitimate governmental objective. *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Where the discrimination challenged is motivated both by impermissible purposes (*e.g.*, animus, negative attitudes, malice, fear, the desire to harm a group, moral disapproval, ignorance) and permissible purposes (under rational basis review, virtually any goal not forbidden by the Constitution), the law may still be constitutionally valid. While "negative attitudes," "fear" or other biases "may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).

Because any single valid rationale is sufficient to support DOMA's constitutionality, I analyze only as many possible interests as necessary to sustain the law. *See F.C.C. v. Beach Commc'n, Inc.*, 508 U.S. 307, 317 (1993). I find that several of BLAG's rationale suffice to satisfy constitutional scrutiny.

*V.      DOMA Survives Rational Basis Review*

The House Report identifies four governmental interests advanced by DOMA: "(1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality; (3) protecting state sovereignty and democratic self-governance; and (4) preserving scarce government resources." (H. Rep. at 12.)

BLAG contends that DOMA is supported by six rationales, all of which independently justify the legislation under rational basis review. DOMA, it is argued, advances governmental interest in: (1) maintaining a uniform federal definition of marriage, (2) preserving the public fisc and respecting prior legislative judgments, (3) exercising caution, (4) recognizing opposite-sex couples' unique ability to procreate, (5) incentivizing the raising of children by their biological parents, and (6) encouraging childrearing in a setting with both a mother and a father.

At oral argument, the Department of Justice confirmed that in 1996, in "a couple of different letters," it indicated to Congress that it believed "courts would uphold section three of DOMA." (Oral Arg. Tr. 42:8–14.) Specifically, in a letter dated May 14, 1996, the Department of Justice indicated to the Honorable Henry J. Hyde, Chairman of the House Committee on the Judiciary, that "[t]he Department of Justice believes that H.R. 3396 [DOMA] would be sustained as constitutional." (H. Rep. at 32.) On May 29, 1996, the Department of Justice again advised Congress, in a letter to the Honorable Charles T. Canady, Chairman of the House Subcommittee

-17-

on the Constitution (Committee on the Judiciary), that DOMA "would be sustained as constitutional if challenged in court, and that it does not raise any legal issues that necessitate further comment by the Department." (*Id.* at 32–33.)

The Department of Justice maintained this position until early 2011, defending DOMA against numerous lawsuits in the intervening years. Indeed, from 2009 through early 2011, the Department of Justice took the position that uniformity and a desire to preserve the status quo vis-à-vis a federal definition of marriage provided a rationale for DOMA sufficient to sustain the law under rational basis review, which was argued to be the applicable standard of scrutiny. *See* Office of Pers. Mgmt. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *Gill v. Office of Pers. Mgmt.*, No. 09-cv-10309 (JLT), at 16–19 (D. Mass. Sept. 18, 2009) (docket entry no. 21); U.S. Dep't of Health and Human Servs. Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss, *Commonwealth of Mass. v. U.S. Dep't of Health and Human Servs.*, No. 09-cv-11156 (JLT), at 28–31 (D. Mass. Oct. 30, 2009) (docket entry no. 17); U.S. Dep't of the Treasury Mot. to Dismiss, *Dragovich v. Dep't of Treasury*, No. 10-cv-1564 (CW), at 18–24 (N.D. Cal. July 2, 2010) (docket entry no. 25); U.S. Office of Pers. Mgmt. Supplemental Br. in Resp. to Ct.'s Order of Oct. 15, 2010, *Golinski v. Office of Pers. Mgmt.*, No. 10-257 (JSW), at 10–15 (N.D. Cal. Nov. 19, 2010) (docket entry no. 83). As late as January of 2011, the Department of Justice told the First Circuit that DOMA was not unconstitutional. *See* Corrected Br. for the U.S. Dep't of Health and Human Servs., *Commonwealth of Mass. v. U.S. Dep't of Health and Human Servs.*, Nos. 10-2204, 10-2207, 10-2214, at 26–55 (1st Cir. Jan. 19, 2011). No relevant facts or law have changed since early 2011 when the Department of Justice last took this position. Indeed, at oral argument, the Department of Justice acknowledged that its current position on DOMA is, in

part, a result of "a decision that has been made by the Attorney General and by the President, [a] constitutional judgment." (Oral Arg. Tr. 42:21–43:6.)

Even now the Department of Justice acknowledges that "a reasonable argument for Section 3's constitutionality may be proffered under" the rational basis standard, and that there exists "substantial circuit court authority applying rational basis review to sexual-orientation classifications." (JA-56, JA-53.) At argument, the Department of Justice summarized its most recent arguments for DOMA's rational basis as "maintaining the status quo" and achieving "a degree of uniformity for federal benefits, coupled with preserving room for state policy development." (Oral Arg. Tr. 44:3–7.)

As explained above, only if there is no conceivable legitimate governmental interest, or DOMA is not rationally related to any such interest, will the statute be unconstitutional under rational basis review.

### A. *Responsible Procreation and Childrearing by Biological Parents*

In enacting DOMA, Congress sought to explicitly recognize, for federal purposes, the biological component of the marital relationship and the legal responsibility of rearing the offspring of such a union. Numerous state high courts have accepted this as a rational basis for excluding same-sex couples, even legally recognized same-sex parents, from the institution of civil marriage. DOMA advances the governmental interest in connecting marriage to biological procreation by excluding certain couples who cannot procreate simply by joinder of their different sexual being from the federal benefits of marital status.

Under rational basis review, courts must consider and credit all rationales for restricting federal marriage benefits to opposite-sex couples that do not evince unconstitutional animus.

Numerous courts have recognized that denying same-sex couples federal marriage rights or even the right to marry at all can be grounded in reasons other than animus. *See Massachusetts v. U.S. Dep't of Health and Human Servs.*, 682 F.3d 1, 16 (1st Cir. 2012) ("*Massachusetts v. HHS*") ("we do not rely upon the charge that DOMA's hidden but dominant purpose was hostility to homosexuality"); *In re Kandu*, 315 B.R. 123, 147–48 (Bankr. W.D. Wash. 2004) (noting that DOMA can be explained by legitimate governmental interests); *Standhardt v. Superior Court*, 77 P.3d 451, 465 (Ariz. Ct. App. 2003) ("Arizona's prohibition of same-sex marriages furthers a proper legislative end and was not enacted simply to make same-sex couples unequal to everyone else."); *Jones v. Hallahan*, 501 S.W.2d 588, 590 (Ky. Ct. App. 1973) ("We do not consider the refusal to issue the [marriage] license [to persons of the same sex] a punishment."); *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 680 (Tex. Ct. App. 2010) (rejecting argument that limiting marriage and divorce to opposite-sex couples is "explicable only by class-based animus"). *See also Lawrence v. Texas*, 539 U.S. 558, 585 (2003) ("Unlike the moral disapproval of same-sex relations—the asserted state interest in this case—other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.") (O'Connor, J., concurring).

The interest in recognizing the connections between marriage and childrearing by biological parents can be broken down into several components. First, DOMA expresses Congressional recognition that "responsible begetting and rearing of new generations is of fundamental importance to civil society." (Amicus Br. of States of Indiana, et al. at 25.) Because the state has an interest in children, the state is thus also interested in preventing "irresponsible procreation," a phenomenon implicated exclusively by heterosexuals. (BLAG Br.

-20-

at 49.)  Because of these legitimate interests, reserving federal marriage rights to opposite-sex couples "protect[s] civil society," Amicus Br. of States of Indiana, et al. at 25, because without the inducement of marriage, opposite-sex couples would accidentally procreate, giving rise to unstable and unhealthy families.  Marriage thus plays the important role of "channel[ing opposite-sex] sexual desires" which, in the absence of marriage, would result in unstable relationships, which have been documented to be harmful to children.  (Amicus Br. of States of Indiana, et al. at 26.)

As stated by BLAG, "[m]arriage attempts to promote permanence and stability, which are vitally important to the welfare of the children of the marriage."  (BLAG Br. at 48–49.)  That is, marriage works to combat the risk of instability which is characteristic of inherently procreative opposite-sex relationships, but absent from same-sex relationships.  *See* Amicus Br. of States of Indiana, et al. at 24 ("civil marriage recognition arises from the need to encourage biological parents to remain together for the sake of their children").[5]  DOMA advances this interest, in that the state only needs to provide incentives to opposite-sex couples in the form of marriage, because only opposite-sex couples have unintended, unplanned, unwanted children.  Same-sex

---

[5] *See also Andersen v. King Cnty.*, 138 P.3d 963, 982–83 (Wash. 2006) ("[A]s *Skinner*, *Loving*, and *Zablocki* indicate, marriage is traditionally linked to procreation and survival of the human race. Heterosexual couples are the only couples who can produce biological offspring of the couple.  And the link between opposite-sex marriage and procreation is not defeated by the fact that the law allows opposite-sex marriage regardless of a couple's willingness or ability to procreate.  The facts that all opposite-sex couples do not have children and that single-sex couples raise children and have children with third party assistance or through adoption do not mean that limiting marriage to opposite-sex couples lacks a rational basis. Such over- or under-inclusiveness does not defeat finding a rational basis."); *Lewis v. Harris*, 875 A.2d 259, 277 (N.J. App. Div. 2005) (Parrillo, J.A.D., concurring) ("[A] core feature of marriage is its binary, opposite-sex nature. . . .  [T]he binary idea of marriage arose precisely because there are two sexes."); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 979 n.1 (Mass. 2003) (Sosman, J., dissenting) ("[T]he reasons justifying the civil marriage laws are inextricably linked to the fact that human sexual intercourse between a man and a woman frequently results in pregnancy and childbirth . . . that fact lies at the core of why society fashioned the institution of marriage in the first place.").

couples, by contrast, reproduce only "deliberately choosing to do so and by devoting a serious investment of time, attention, and resources." (Amicus Br. of States of Indiana, et al. at 35.)

Numerous courts have accepted this rationale as a basis for excluding same-sex couples from civil marriage. The New York Court of Appeals, for instance, determined that

> The Legislature could . . . find that [heterosexual] relationships are all too often casual or temporary. It could find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born. It thus could choose to offer an inducement—in the form of marriage and its attendant benefits—to opposite-sex couples who make a solemn, long-term commitment to each other. The Legislature could find that this rationale for marriage does not apply with comparable force to same-sex couples. These couples can become parents by adoption, or by artificial insemination or other technological marvels, but they do not become parents as a result of accident or impulse. The Legislature could find that unstable relationships between people of the opposite sex present a greater danger that children will be born into or grow up in unstable homes than is the case with same-sex couples, and thus that promoting stability in opposite-sex relationships will help children more.

*Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006) (plurality opinion). *See also Andersen*, 138 P.3d at 1002 (Johnson, J., concurring); *Morrison v. Sadler*, 821 N.E.2d 15, 24–25 (Ind. Ct. App. 2005).

DOMA furthers the interest in recognizing the link between marriage and procreation for the reasons noted by the Maryland Court of Appeals:

> [S]afeguarding an environment most conducive to the stable propagation and continuance of the human race is a legitimate government interest. The question remains whether there exists a sufficient link between an interest in fostering a stable environment for procreation and the means at hand used to further that goal, i.e., an implicit restriction on those who wish to avail themselves of

State-sanctioned marriage. We conclude that there does exist a sufficient link. . . . This "inextricable link" between marriage and procreation reasonably could support the definition of marriage as between a man and a woman only, because it is that relationship that is capable of producing biological offspring of both members (advances in reproductive technologies notwithstanding).

*Conaway v. Deane*, 932 A.2d 571, 630–31 (Md. 2007) (internal citations omitted).

Another component of the procreation and childrearing rationale for restricting federal rights to opposite-sex marriage is the Congressional desire to have children raised in families with only biological mothers and fathers, which same-sex couples cannot provide. Thus, BLAG contends that DOMA "offer[s] special encouragement for relationships that result in mothers and fathers jointly raising their biological children," an interest which "simply does not apply to same-sex couples." (BLAG Br. at 54.) DOMA accomplishes this encouragement by limiting federal marriage rights to opposite-sex couples.

Congress might well have enacted DOMA after consulting "the entire history of civilization" regarding the "problems" that arise when there is no institution to encourage biological parents to remain together. (Amicus Br. of States of Indiana, et al. at 35.) This, too, has been accepted as a rational reason for excluding same-sex couples (including legally recognized same-sex parents) from civil marriages. *See, e.g.*, *Hernandez*, 855 N.E.2d at 8 (plurality opinion) ("Plaintiffs seem to assume that they have demonstrated the irrationality of the view that opposite-sex marriages offer advantages to children by showing there is no scientific evidence to support it. Even assuming no such evidence exists, this reasoning is flawed. In the absence of conclusive scientific evidence, the Legislature could rationally proceed

on the commonsense premise that children will do best with a mother and father in the home.").[6]

I agree with BLAG that the evidence offered by Windsor and the professional organizations and child welfare amici who advocate for affirmance does not make Congress's "common sense" regarding the needs of children a forbidden governmental interest under rational basis review. (BLAG Br. at 55.)

As noted hereafter in the context of uniformity, the manner in which DOMA furthers the legitimate governmental interests in childrearing, responsible procreation, and biological parentage respects the principles of federalism. States may still arrive at individual determinations regarding who may and may not marry, and DOMA does nothing to change this functioning of our federal system.[7] DOMA simply excludes certain couples who are married under state law from eligibility for certain *federal* rights, benefits, privileges, and obligations.

DOMA's exclusion of married same-sex couples, under the rational basis review where means and ends need not match, *see Heller*, 509 U.S. at 321, is sufficiently related to the federal interest in recognizing the link between the marital relationship and the rearing of its offspring.

---

[6] Amici American Psychological Association, American Academy of Pediatrics, American Psychiatric Association, American Psychoanalytic Association, National Association of Social Workers, and New York State Psychological Association argue that no such credible evidence exists. *See* Amicus Br. of the American Psychological Association, et al. at 15–23.

[7] The majority's holding that DOMA's definition of marriage as between a man and a woman is unconstitutional will doubtless be used to invalidate the laws in those forty-one states. Such has to be so given the fact that the equal protection analysis by the majority in this case for federal purposes pursuant to the Fifth Amendment is the same as that to be applied as to the states pursuant to the Fourteenth Amendment and is, therefore, the yardstick by which to hold unconstitutional the law in the forty-one states. Indeed, an affirmance by the Supreme Court of the majority's view would likely doom the laws of the forty-one states which exclude same-sex couples from civil marriage.

-24-

**B.** *Maintaining the Status Quo of Uniformity*

BLAG contends that DOMA is rationally related to the legitimate governmental "interest in uniform eligibility for federal marital benefits." (BLAG Br. at 39.) Congress, it is argued, has a "long history of enacting federal definitions of marriage that do not simply incorporate state definitions and inevitably will conflict with some of them." (*Id.* at 42–43.) A uniform federal definition of marriage "ensures that similarly-situated couples will have the same benefits regardless of which state they happen to live in." (*Id.* at 39–40.) The District Court expressed skepticism regarding the legitimacy of this end, but principally rejected this justification because DOMA "intrude[s] upon the states' business of regulating domestic relations." (JA-1007–09.) Windsor and various amici argue that "[t]he federal government [has always] accepted states' determinations of who was validly married – no matter how far states' criteria for validity diverged from one other," Historians Amicus Br. at 15, and that the promulgation of a federal definition of marriage "injects the federal government into domestic relations law and works to delegitimize both the lawful marriages of thousands of same-sex couples and the considered judgments of . . . [s]tates to sanction same-sex marriages, . . . intrud[ing] on core state powers." (States of New York, Vermont, and Connecticut Amicus Br. at 14.)

The subject of domestic relations, including marriage, has been the province of the states. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) ("Long ago we observed that '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'") (quoting *In re Burrus*, 136 U.S. 586, 593 (1890)). But DOMA does not change this, and does nothing to strip the status that

states confer on couples they marry. Instead, DOMA limits the *federal* benefits, rights, privileges, and responsibilities of marriage to a subset of those deemed married under state law.

That the federal government often defers to state determinations regarding marriage does not obligate it to do so. While a state may be perfectly disinterested in prying into the reasons a couple marries, the federal government remains deeply and properly concerned with the reason(s) why a couple weds. *See Massachusetts v. HHS*, 682 F.3d at 12 ("Congress surely has an interest in who counts as married. The statutes and programs that section 3 governs are federal regimes such as social security, the Internal Revenue Code and medical insurance for federal workers; and their benefit structure requires deciding who is married to whom.").

For example, when people marry for immigration purposes, the federal government may validly deem the marriage "fraudulent," even though it remains valid under state law. *See* 8 U.S.C. § 1325(c) ("Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both."); 8 U.S.C. §§ 1154(a)(2)(A), 1255(e). Courts have recognized this principle. *See, e.g.*, *Taing v. Napolitano*, 567 F.3d 19, 21 (1st Cir. 2009) (plaintiff remained a "spouse" and "immediate relative" under the Immigration and Naturalization Act, even if her marriage actually ceased under state law upon the death of her spouse); *Adams v. Howerton*, 673 F.2d 1036, 1040–41 (9th Cir. 1982) (even same-sex marriage valid under state law does not count as a marriage for federal immigration law purposes); *Lutwak v. United States*, 344 U.S. 604, 610–11 (1953) (noting a marriage's adherence to local law is immaterial if the marriage was "part of [a] conspiracy to defraud the United States"). Tellingly, Windsor does not argue that federal Immigration and Customs Enforcement interferes with

traditional state functions when it leaves states free to recognize, for their own purposes, any marriage they like but refuses to grant legal residency to immigrants it believes married only to secure the benefits of marriage.

DOMA alters the general, but by no means unyielding, practice of the federal government accepting marriages recognized by state law. However, at the time Congress acted, all states recognized only opposite-sex marriages, and the fact that Congress chose to maintain that status quo in response to this new, evolving social issue does not invalidate its legislative interest. It may be that, prior to DOMA, any federal "definition" of marriage was limited to advancing the targeted goal of a particular federal program, not a blanket, undifferentiated policy choice imposed on statuses created by states. *See Massachusetts v. HHS*, 682 F.3d at 12. But this fact does not render the asserted interest in uniformity illegitimate or so lacking a "footing in the realities of the subject addressed by the legislation" as to fail rational basis review. *Heller*, 509 U.S. at 321.

Section 3 of DOMA was enacted as the debate regarding marriage equality was just beginning in the states. At that time, no state had actually permitted same-sex couples to marry. In the intervening years, six states and the District of Columbia have enacted statutes or issued court decisions that permit same-sex marriage.[8] On the other hand, thirty states have amended their founding documents by constitutional amendment to prohibit same-sex marriage, and eleven more states have enacted statutes to the same effect.[9] Given the evolving nature of this

---

[8] *See* N.Y. Dom. Rel. Law § 10-a (McKinney 2011); N.H. Rev. Stat. § 457:1-a (2010); D.C. Stat. § 46-401 (2010); Vt. Stat. Ann. tit. 15 § 8 (2009); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Goodridge*, 798 N.E.2d 941 (Mass. 2003).

[9] *See* Ala. Const. Art. I, § 36.03; Ala. Code § 30-1-19; Alaska Const. Art. 1, § 25; Alaska Stat. § 25.05.013; Ariz. Const. Art. 30 § 1; Ariz. Rev. Stat. §§ 25-101 & 25-112; Ark. Const. Amend. 83, § 1; Ark. Code Ann. §§ 9-11-109,

-27-

issue, Congress was entitled to maintain the status quo pending further developments. Otherwise, "marriage" and "spouse" for the purposes of federal law would depend on the outcome of this debate in each state, with the meanings of those terms under federal law changing with any change in a given state. As Windsor rightly notes, prior to DOMA, a state's authorization of same-sex marriage had numerous implications for federal laws to the extent those laws were construed to incorporate state-law definitions of marriage. In order to avoid federal implications of state-law developments in the area of marriage, Congress, by enacting DOMA, reasonably froze federal benefits policy as it existed in 1996 with respect to same-sex marriage.

The federal government can legitimately limit the national impact of state-level policy development. Doing so facilitates the ability of the states to serve as laboratories of policy development. As the Massachusetts Supreme Court stated when it held that the Massachusetts state constitution required allowing same-sex couples to marry, "[t]he genius of our Federal

9-11-107, 9-11-208; Cal. Const. Art. I, § 7.5; Colo. Const. Art. 2, § 31; Colo. Rev. Stat. § 14-2-104; 13 Del. Code Ann. § 101; Fla. Const. Art. 1 § 27; Fla. Stat. § 741.212; Ga. Const. Art. 1, § 4, I; Ga. Code Ann. § 19-3-3.1; Haw. Const. Art. 1, § 23; Haw. Rev. Stat. § 572-1; Idaho Const. Art. III, § 28; Idaho Code Ann. §§ 32-201 & 32-209; 750 Ill. Comp. Stat. 5/212; Ind. Code § 31-11-1-1; Kan. Const. Art. 15, § 16; Kan. Stat. Ann. §§ 23-101 & 23-115; Ky. Const § 233A; Ky. Rev. Stat. Ann. §§ 402.005 & 402.020; La. Const. Art. 12, § 15; La. Civ. Code Ann. Art. 86, 89; Me. Rev. Stat. Ann. tit. 19-A, § 701; Md. Code Ann., Fam. Law, § 2-201; Mich. Const. Art. 1, § 25; Mich. Comp. Laws § 551.1; Minn. Stat.§ 517.03; Miss. Const. Art. 14, § 263A; Miss. Code Ann. § 93-1-1; Mo. Const. Art. I, § 33; Mo. Rev. Stat. § 451.022; Mont. Const. Art. XIII, § 7; Mont. Code Ann. § 40-1-401; Neb. Const. Art. I, § 29; Nev. Const. Art. 1, § 21; N.C. Gen. Stat. § 51-1.2; N.D. Const. Art. XI, § 28; N.D. Cent. Code §§ 14-03-01 & 14-03-08; Ohio Const. Art. 15, § 11; Ohio Rev. Code Ann. § 3101.01(C); Okla. Const. Art. 2, § 35; Okla. Stat. Ann. tit. 43, § 3.1; Or. Const. Art. XV, § 5a; 23 Pa. Cons. Stat. §§ 1102, 1704; S.C. Const. Art. XVII, § 15; S.C. Code Ann. § 20-1-15; S.D. Const. Art. 21, § 9; S.D. Codified Laws § 25-1-1; Tenn. Const. Art. XI, § 18; Tenn. Code Ann. § 36-3-113; Tex. Const. Art. 1, § 32; Tex. Fam. Code Ann. §§ 2.001(b) & 6.204; Utah Const. Art. I, § 29; Utah Code Ann. §§ 30-1-2(5) & 30-1-4.1; Va. Const. Art. 1, § 15-A; Va. Code Ann. §§ 20-45.2 & 20-45.3; Wash. Rev. Code § 26.04.010(1); W. Va. Code § 48-2-603; Wis. Const. Art. XIII, § 13; Wis. Stat. §§ 765.001(2) & 765.04; Wyo. Stat. Ann. § 20-1-101. The statutory prohibitions or amendments of nineteen of these forty-one states forbid not only same-sex marriage, but any other form of relationship recognition, such as domestic partnership or civil union, between two persons of the same sex.

system is that each State's Constitution has vitality specific to its own traditions, and that . . . each State is free to address difficult issues of individual liberty in . . . its own" manner. *Goodridge*, 798 N.E.2d at 967.

Windsor argues that DOMA upends, rather than preserves, the status quo of Congressional control over the meaning of marriage for federal purposes. But this argument is contrary to the clear legal landscape at the time of DOMA's enactment—that is, at the time, all states were in full accord in recognizing only opposite-sex marriages. Congress's actions allow it to maintain a "wait-and-see" approach in the face of evolving state approaches to same-sex marriages, thereby avoiding the need to immediately deal with the potentially significant impact on federal law that a state's recognition of same-sex marriage could have. Indeed, the far-reaching impact of the federal definition of marriage in terms of rights, benefits, responsibilities, and privileges (upon which Windsor places great emphasis) means that Congressional action can quite reasonably be understood to have perceived this potential impact and decided that it was in the federal government's interest to maintain consistency and uniformity in distributing federal benefits and administering federal programs.

Congress may, and both parties agree that it often does, borrow definitions from state law, but Windsor is incorrect to suggest that it is required to do so or is irrational when it does not. Put directly, Congress may also legitimately take an approach that attempts to create uniformity across the states. In DOMA, Congress chose to adopt a uniform federal definition of "marriage" and "spouse" for purposes of federal laws. Congress could rationally conclude that maintaining the status quo at the federal level during a period of flux would allow states that

wish to make changes in the legal definition of marriage to retain their inherent prerogative to do so, while permitting others to maintain the traditional view.

Rational basis review embodies the principle that, as Congress did in enacting DOMA, legislatures are free to refine their "preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 524 (2007). Contrary to Windsor's contention, the preservation of the status quo—the definition of marriage that was uniform among all fifty states in the year of DOMA's passage—constitutes a legitimate governmental interest insofar as it allows Congress the ability to "wait and see" how the issue of same-sex marriage would take shape among the many and diverse states of our nation.

The uniformity that DOMA recognized and maintained has been recognized both explicitly and implicitly by courts for many years from various jurisdictions across the nation. Perhaps most explicitly, the Supreme Court stated:

> [N]o legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take rank as one of the co-ordinate states of the Union, than that which seeks to establish it on the basis of the idea of family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement.

*Murphy v. Ramsey*, 114 U.S. 15, 45 (1885).

Other courts have explained that this uniformity has not always been explicit or necessary to state. Almost forty years ago a Washington state court put it thus: "[A]lthough it appears that the appellate courts of this state until now have not been required to define specifically what

constitutes a marriage, it is apparent from a review of cases dealing with legal questions arising out of the marital relationship that the definition of marriage as the legal union of one man and one woman who are otherwise qualified to enter into the relationship not only is clearly implied from such cases, but also was deemed by the court in each case to be so obvious as not to require recitation." *Singer v. Hara*, 522 P.2d 1187, 1191–92 (Wash. Ct. App. 1974). *See also Jones v. Hallahan*, 501 S.W.2d 588, 590 (Ky. Ct. App. 1973) ("In substance, the [marital] relationship proposed by the [same-sex] appellants does not authorize the issuance of a marriage license because what they propose is not a marriage.").

Cases predating *Murphy* demonstrate that the Supreme Court consistently lauded this conception of marriage as a critical social institution. *See Reynolds v. United States*, 98 U.S. 145, 165-66 (1878) ("Marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties.").

Subsequent to *Murphy,* the Supreme Court has continued to view the biological link of parents to children as deserving of special recognition and protection. *See Michael H. v. Gerald D.*, 491 U.S. 110, 120 n.1 (1989) (indicating that where, *inter alia*, a "husband and wife" are "cohabiting," there is a presumption that they are in a "harmonious and apparently exclusive marital relationship"); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (noting the special "intimate relation of husband and wife"); *see also Lawrence v. Texas*, 539 U.S. 558, 567 (2003) ("[I]t would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse."). And marriage has been noted to carry special legal entitlements for those men and women who enter into it. *See, e.g.*, *Griswold¸* 381 U.S at 495 (noting it is hard to

conceive of what "is more private or more intimate than a husband and wife's marital relations" and "the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected" in the Constitution) (Goldberg, J., concurring); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (determining right to "marry, establish a home and bring up children" is a liberty right under the Fourteenth Amendment).[10]

The Supreme Court also has taken care to preserve and distinguish the rights of the natural—that is, biological—family over "families" other than the biological. *See Lehr v. Robertson*, 463 U.S 248, 256–57 (1983) ("The institution of marriage has played a critical role both in defining the legal entitlements of family members and in developing the decentralized structure of our democratic society. In recognition of that role . . . state laws almost universally express an appropriate preference for the formal family.") (footnotes omitted).[11] It has noted that "the Constitution protects the sanctity of the family precisely because the institution of the family

_____

[10] *See also Caban v. Mohammed*, 441 U.S. 380, 397 (1979) ("Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship . . . , it by no means follows that each unwed parent has any such right.") (internal citations omitted) (Stewart, J., dissenting); *Poe v. Ullman*, 367 U.S. 497, 553 (1961) (recognizing that "the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected," and noting also that the "State" may "exert its power . . . to say who may marry") (Harlan, J., dissenting).

[11] *See also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting the "absence of dispute" that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment," and noting that "[e]ven when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life"); *Trimble v. Gordon*, 430 U.S. 762, 769 (1977) (describing the "family unit" as "perhaps the most fundamental social institution of our society"); *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 823, 843–45 (1977) (noting New York State's support of laudable policy that "natural parents" provide the "positive, nurturing family relationships" and "normal family life in a permanent home" that offers the "best opportunity for children to develop and thrive" and noting the "usual understanding of 'family' implies biological relationships") (internal citations omitted); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious . . . than property rights.") (internal citations and quotations omitted); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents.").

is deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (Powell, J., plurality opinion). The Court has indicated repeatedly that "history and tradition" are the "source for 'supplying . . . content to th[e] Constitutional concept'" that biological family units are afforded additional protections under our nation's laws. *Id.* at 540 (citing *Poe v. Ulman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). Thus, it is and always has been the "'traditions and (collective) conscience of our people,'" not the "personal and private notions" of judges, that determine societal rights, including what marriage is as an institution and who is entitled to participate in it. *Griswold*, 381 U.S. at 493 (citing *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 105 (1934)) (Goldberg, J., concurring).

In light of these decisions relying on the traditional understanding of marriage as only between one man and one woman, I join Justice Black in the sentiment that "[o]ne of the most effective ways of diluting or expanding a constitutionally guaranteed right is to substitute for the crucial word or words of a constitutional guarantee another word or words, more or less flexible and more or less restricted in meaning." *Griswold*, 381 U.S. at 509 (Black, J., dissenting).

Marriage today, according to the federal government, means what it has always meant—a holy union, essential to the survival of the species, between a man and a woman, the principal purpose of which is to encourage responsible child rearing. *Murphy* set forth this understanding, *Baker v. Nelson* reaffirmed it, and no Supreme Court case since *Murphy* gives me reason to doubt that definition should not still stand.

Having found the interest in maintaining uniformity (including in the form of the 1996 status quo) legitimate, the means employed to advance this goal appear appropriate. As noted above, BLAG argues that DOMA "ensures that *similarly-situated* couples [*i.e.*, married same-sex

couples and all unmarried couples] will have the same federal benefits [*i.e.*, none] regardless of which state they happen to live in, and avoids a confusing situation in which same-sex couples would lose (or gain) federal marital status simply by moving between states with different policies on recognition of same-sex marriages." (BLAG Br. at 39–40 (emphasis added).) The relevant discrimination, however, to be justified by BLAG is DOMA's differential treatment of married couples based on the sex of the persons constituting the couple. Married same-sex couples are similarly-situated to married opposite-sex couples with respect to the relevant characteristic at issue: marital status.

Windsor claims that the line DOMA draws fails rational basis review because the purported justifications for the discrimination "make no sense" and "are impossible to credit" in light of how the groups at issue are similarly situated. However, the regulation of federal programs is emphatically the province of Congress. Having not previously defined the scope of federal programs the way DOMA does should not forever bind Congress's hands from doing so, or make Congressional action nonsensical, especially when viewed in light of the clear and unaltered judicial characterization of the nation's historical understanding of marriage.

Windsor contends that DOMA creates complexity and establishes two tiers of married couples in states that permit same-sex marriage. But the question of uniformity of marriage at the state level is not DOMA's concern. While the tension between state and federal policies in this area are real, they are no greater than those that have existed *among* the states—tensions which Windsor acknowledges reflect the essence of, and have endured under, our federal system.

I conclude, therefore, that it was rational for Congress to prefer uniform substantive eligibility criteria for federal marital benefits for same-sex couples over "uniform" deference to

-34-

varying state criteria. Such a goal may be an exception to Congress's general deference to the states in the area of marriage (even in the face of contentious state-level variation) but this in no way makes the legislative classification employed in pursuit of uniformity irrational in light of the tremendous deference we afford acts of Congress under rational basis review. *See Heller*, 509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.").

When, as here, an issue involves policy choices, the Supreme Court has cautioned that "the appropriate forum for their resolution in a democracy is the legislature." *Maher v. Roe*, 432 U.S. 464, 479 (1977). DOMA rationally serves the legitimate government interest in maintaining the status quo of the definition of marriage pending evolution of the issue in the states.

* * *

Because the recognition of the biological connection of marriage to childrearing and the pursuit of uniformity (including in the form of preserving the status quo) are sufficient to support DOMA under rational basis review, I choose not to discuss the other asserted rationales. *Beach Commc'ns*, 508 U.S. at 317. Nevertheless, I next address whether sexual orientation classifications should, as a matter of first impression in this Circuit, be subject to heightened scrutiny in an equal protection analysis.

## VI.     *Appropriate Level of Review for Sexual Orientation Discrimination*

The Supreme Court has reserved heightened scrutiny for a small number of subject classifications—principally race, alienage, nationality, sex, and illegitimacy. Heightened scrutiny attaches in recognition that these traits have been used to impose, and are therefore

closely associated with, social inequality. Therefore, government conduct that employs these classifications is suspect and must have more than a legitimate or merely permissible justification.

The question of the appropriate level of scrutiny for laws that discriminate in respect of the definition of marriage on the basis of sexual orientation is an issue of first impression in this Circuit. *See Able v. United States*, 155 F.3d 628, 632 (2d Cir. 1998) (declining to consider, in military context where judicial deference is "at its apogee," the question whether sexual orientation discrimination would trigger heightened scrutiny because challengers did not argue for "any more onerous standard than the rational basis test" and therefore "the sole question before us is whether the Act survives rational basis review").

"[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 441–42 (1985). The Supreme Court has repeatedly rejected arguments by litigants and rulings by lower courts that would grant heightened review to legislative distinctions based on mental handicap, *id.* at 442–47, kinship, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), age, *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976), and poverty, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973).

The Supreme Court, despite having the opportunity to apply heightened review, invalidated the provision of the Colorado Constitution challenged in *Romer* under rational basis

-36-

review. *See* 517 U.S. 620 (1996). That *Romer* was decided under the rational basis standard without a need to employ a more exacting level of review does not mean that the question of the appropriate tier of equal protection scrutiny was not before the Court. Indeed, although the *Romer* plaintiffs "elected not to appeal" the lower court's determination that sexual orientation does not constitute a "suspect" or "quasi-suspect" classification, the Supreme Court "evidently agree[d] that 'rational basis' . . . is the governing standard." *Romer*, 517 U.S. at 641 n.1 (Scalia, J., dissenting).

Until the majority's opinion, DOMA had never been held by the Supreme Court or any Circuit Court to involve a suspect or quasi-suspect classification. Indeed, in light of the Supreme Court's reluctance to apply heightened scrutiny to new categories of discrimination, and in consideration of the fact that it declined to do so in *Romer*, eleven other circuits have also not taken this step. *See Massachusetts v. HHS*, 682 F.3d at 9; *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012); *Perry v. Brown*, 671 F.3d 1052, 1082 (9th Cir. 2012); *Cook v. Gates*, 528 F.3d 42, 61–62 (1st Cir. 2008); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Thomasson v. Perry*, 80 F.3d 915, 927–28 (4th Cir. 1996); *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 573–74 (9th Cir. 1990); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989); *Padula v. Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987); *Nat'l Gay Task Force v. Bd. of Educ. of City of Okla. City*, 729 F.2d 1270, 1273 (10th Cir. 1984), *aff'd by an equally divided court*, 470 U.S. 903 (1985) (per curiam). In *Massachusetts v. HHS*,

the First Circuit rejected the application of strict and intermediate scrutiny, recognized that DOMA satisfies rational basis review, and yet went on to create a novel "plus" level of scrutiny applicable to DOMA, in contravention of the Supreme Court's holding in *Baker*. Such judicial impositions of new levels of review deprive the American people of further consideration of DOMA through their democratically elected representatives.

Significantly, numerous Circuit Courts of Appeals decisions declining to extend heightened scrutiny to sexual orientation discrimination post-date both *Romer v. Evans* and *Lawrence v. Texas*. Windsor argues that the determinations made regarding the appropriate level of scrutiny in decisions such as *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008) (rational-basis review applies, and "*Lawrence* does not alter this conclusion") and *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (Circuit precedent requiring rational-basis review "was not disturbed by *Lawrence*, which declined to address equal protection") are distinguishable because the cases arose in a military context where judicial deference is "at its apogee." *See Able*, 155 F.3d at 632. But as the voluminous authority cited above makes clear, *see* Section IV, *supra*, whatever additional deference courts afford Congressional action in the military context, rational basis review is, even in the civilian context, highly deferential to the legislature, not a mechanism for judges to second guess properly enacted legislative judgments, and the "paradigm of restraint." *See Beach Commc'ns*, 508 U.S. at 314. *See also Perry*, 671 F.3d at 1080 n.13 (relying, in the civilian context, on rulings that declined to apply heightened scrutiny to sexual orientation classifications in the military context). Indeed, the Department of Justice so acknowledged last year—until it changed its constitutional position following the President's announcement of a change in policy.

-38-

Therefore, I would join these eleven circuits, driven not only by a reluctance to do that which the Supreme Court itself has not undertaken when given the chance, but also out of routine respect for extant precedent. Subjecting the federal definition of marriage to heightened scrutiny would defy or, at least, call into question the continued validity of *Baker*, which we are not empowered to do. *Baker* involved a law that prohibited same-sex marriage, and thus discriminated on the basis of sexual orientation. Holding that sexual orientation merits heightened scrutiny would be substantively inconsistent with *Baker* since (1) any legislative action faces a high likelihood of invalidation under heightened scrutiny, and (2) it would be curious to apply heightened scrutiny to a form of discrimination that does not raise a substantial federal question of constitutional law. *See Massachusetts v. HHS*, 682 F.3d at 9 ("[T]o create such a new suspect classification for same-sex relationships would have far-reaching implications—in particular, by implying an overruling of *Baker*, which we are neither empowered to do nor willing to predict."). Any such development must come from the elected representatives of the American people.[12]

---

[12] Indeed, one elected representative—the President—has already taken steps to mitigate the harms visited upon same-sex couples by DOMA. The President has issued a memorandum requiring all executive departments and agencies to take steps, consistent with existing law, to extend benefits to the same-sex domestic partners of federal employees, and where applicable, to the children of same-sex domestic partners of federal employees. *See* Presidential Memorandum, Extension of Benefits to Same-Sex Domestic Partners of Federal Employees (June 20, 2010). The Office of Personnel Management ("OPM") was directed to clarify that for purposes of employee assistance programs, same-sex domestic partners and their children qualify as "family members." In addition, pursuant to a Presidential Memorandum Regarding Federal Benefits and Non-discrimination (June 17, 2009), OPM issued regulations expanding the definition of "qualified relatives" to include same-sex domestic partners of eligible federal employees in the federal long-term care insurance program. *See* 5 CFR 875.213 (June 1, 2010).

In Congress, efforts provide various types of federal benefits for same-sex domestic partners—such as health insurance, life insurance, pensions, and other employment-related benefits—are routinely introduced, if unsuccessful. *See, e.g.*, S. 2521, 110th Cong. (2007); H.R. 4838, 110th Cong. (2007) (bills died in committee); S. 1102, 111th Cong. (2009); H.R. 2517, 111th Cong. (2009) (no action taken on either version after being reported out

Whatever the merits of doing so in a context other than the marital union, I conclude that, in respect of the unique institution of marriage it would be imprudent to announce a new rule under which sexual orientation is subject to heightened scrutiny.

**CONCLUSION**

For the foregoing reasons, I would hold that per *Baker*, the legislative distinction drawn by DOMA satisfies rational basis review and is therefore constitutional.

Whether connections between marriage, procreation, and biological offspring recognized by DOMA and the uniformity it imposes are to continue is not for the courts to decide, but rather an issue for the American people and their elected representatives to settle through the democratic process. Courts should not intervene where there is a robust political debate because doing so poisons the political well, imposing a destructive anti-majoritarian constitutional ruling on a vigorous debate. Courts should not entertain claims like those advanced here, as we can intervene in this robust debate only to cut it short.

I respectfully dissent from the majority opinion to the extent it holds otherwise.

---

of committees); S. 1910, 112th Cong. (2011) (reported out of committee); H.R. 3485, 112th Cong. (2011) (remains in committee).